[No. S004457. Crim No. 22700. June 27, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
TROY LEE JONES, Defendant and Appellant.

**COUNSEL**

Frank O. Bell, Jr., State Public Defender, Richard L. Phillips and Charles M. Bonneau, under appointments by the Supreme Court, and Monica Knox, Deputy State Public Defender, for Defendant and Appellant.

Melissa W. Johnson as Amicus Curiae on behalf of Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Steve White and George Williamson, Chief Assistant Attorneys General, Robert R. Anderson, Assistant Attorney General, Michael T. Garcia, Edmund D. McMurray, Ward A. Campbell, W. Scott Thorpe and Clayton S. Tanaka, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**GEORGE, C. J.**—Following the guilt phase of a jury trial, the jury found defendant Troy Lee Jones guilty of first degree murder (Pen. Code, §§ 187, 189),[1] and found true both the allegation of personal use of a firearm in the commission of the offense (§ 12022.5) and the special circumstance that the murder was committed for the purpose of preventing the victim from testifying in a criminal proceeding (§ 190.2, subd. (a)(10)). After the penalty phase of the trial, the jury fixed the punishment at death. This appeal from the judgment imposing the death penalty is automatic. (§ 1239, subd. (b).)

In the companion habeas corpus proceeding, we conclude that the judgment must be vacated in its entirety, based upon defense counsel's constitutionally deficient performance at trial. (*In re Jones* (1996) 13 Cal.4th 552 [54 Cal.Rptr.2d 52, 917 P.2d 1175].) Therefore, many of the issues raised on appeal need not be resolved, and we dismiss the appeal itself as moot. For the guidance of the trial court in the event of a retrial, however, we shall address certain issues that are likely to arise upon retrial.

### FACTS

I.  *Guilt Phase*

A.  *The prosecution's case*

1.  *Overview*

The prosecution alleged that, in December 1981, defendant fatally shot Carolyn Grayson, a prostitute with whom defendant had maintained a stormy romantic relationship. Although defendant was charged only with the murder of Grayson, evidence relating to the January 1981 murder of Grayson's neighbor, Janet Benner, was introduced by the prosecution to support its

---

[1]All further statutory references are to the Penal Code unless otherwise indicated.

theory that defendant killed Grayson in order to prevent her from testifying in a criminal proceeding as to defendant's participation in the Benner murder.

### 2. The death of Janet Benner

Janet Benner was an elderly woman who resided in an apartment building located in the City of Fresno. Benner was acquainted with Carolyn Grayson (who resided in another unit in the building) and had befriended Grayson's seven-year-old daughter, Sauda Smith or "Shy," who visited Benner on occasion, sometimes watching television with her. Defendant lived with Grayson and Sauda on an intermittent basis from mid-1980 until Grayson's death on or about December 22, 1981.

Although the precise date of Benner's death was not established at trial, the prosecution introduced evidence showing that the last check drawn on her personal checking account was dated January 19, 1981, and that on January 22, 1981, defendant, using the alias Don Ray Hill, pawned Benner's Smith Corona adding machine at Federal Jewelry and Loan in Fresno. During the week immediately thereafter, one of Benner's neighbors detected a foul odor wafting through the apartment building.

On February 16, 1981, Janet Benner's body was discovered in an advanced state of decomposition, lying on the bathroom floor of her apartment, her face covered with a pillow. An autopsy performed that day revealed that Benner had died as a result of manual strangulation, probably during the latter half of January 1981. Benner's apartment had been ransacked, telephone wires had been cut, and money had been removed from her purse. Her television, stereo, and adding machine were missing.

### 3. Carolyn Grayson's statements to others regarding defendant's involvement in the death of Janet Benner

To establish a connection between defendant and the death of Janet Benner, the prosecution intended to elicit the testimony of defendant's brother, Marlow Jones.[2] After the prosecution informed the trial court that Marlow could not be located, the trial court declared him to be "unavailable" within the meaning of Evidence Code section 240, subdivision (a)(5), and thereafter permitted the introduction of Marlow's testimony that had been adduced at the preliminary hearing in the present proceedings. At that hearing, when asked what Grayson had told him regarding Janet Benner's

---

[2]To avoid confusion, we refer on occasion to members of defendant's family by their first names only.

death, Marlow testified over unsuccessful objections by the defense (on hearsay and other grounds): "She [Carolyn Grayson] told me [in July 1981] that she knocked on the door [to Janet Benner's apartment], and some lady come to the door and answered it, and Troy [the defendant] come in, and [Grayson] stepped aside, and he grabbed the woman and strangl[ed] her and she—she got to hollering 'Help me . . . . Carolyn, help me. Carolyn, help me.' "

The prosecution also introduced the testimony of Grayson's daughter, Sauda, who was eight years of age at the time of defendant's trial. When asked by *defense counsel* on cross-examination whether she remembered a conversation she had had with her mother, in the summer of 1981, regarding defendant, Sauda testified: "My mother—my mother says that Troy had killed—killed Janet. And she didn't tell me nothing else."

### 4. *The plot to kill Carolyn Grayson*

Defendant's sister, Barbara Jones, testified that, "around November 1st[, 1981]," she overheard a conversation between defendant and their mother, Margaret Payne, at Payne's residence, during which defendant "was pretty nervous . . . and told my mom that he felt Carolyn was getting ready to talk." Barbara stated that defendant told Payne, "I knew I should have killed the bitch when I killed the white bitch." The identity of the person referred to by defendant as the "white bitch" is not disclosed by the record. According to Barbara, defendant's mother replied, "Well, it's either your life or hers."[3]

On approximately November 3, 1981, defendant contracted pneumonia and was hospitalized. Barbara testified that she and her mother discussed killing Grayson by giving her poisoned Tylenol capsules: "[M]y mom said that would be the right time [to kill Grayson], [be]cause that's the best alibi in the world for him to be, you know, in the hospital on the weekend so they knew it wouldn't have been him. So, um, Troy gave me $20 and he went into the hospital, and my mom, um, gave me some money, and I went and got the pills and got the stuff for her. And we brought it back here, and my mom

---

[3]On cross-examination, Barbara testified that, prior to the conversation she overheard between defendant and her mother, "I probably took some valiums . . . and I was already smoking a joint." She believed defendant also "brought some weed in," and "[w]e smoked some weed."

On redirect examination, the prosecution played for the jury a taped conversation between Barbara and Detective David Hopper of the Fresno Police Department, during which she thus recalled the conversation between defendant and Margaret Payne: "[M]y mom said, 'Well, if you think she's going to talk . . . . Well, you know, it's either your life or hers, you know, get rid of her, you know.' "

mixed it up [filling the capsules with glass and, subsequently, with Drano drain cleaner] and everything, you know, and we gave it to her for two days straight, and nothing happened."

Barbara testified further that, in response to Grayson's complaints about cramps after having ingested the adulterated pills, defendant encouraged Grayson to "go to the hospital to have yourself checked," informing Barbara, "I'm glad Carolyn didn't die you know, I'm glad nothing happened to her."

On Thanksgiving Day, 1981, Joanne Jones (another sister of defendant) and Tanya Jones (defendant's wife) discussed the plot to kill Grayson. According to Barbara's testimony, Tanya said: " 'Ah, that's a die-hard bitch, she's not going to die,' you know, like this. Yeah, you see, we had put glass into the pills, and that didn't kill her. So we poisoned her, didn't do it. So the only way to kill her would be a bullet." Barbara testified further that "Tanya was kinda upset because she—I guess she felt she was losing Troy to Carolyn . . . [a]nd that's when . . . she says: 'He don't want to kill the bitch,' she says, 'But the only way to kill her is—she's a diehard bitch, is with a gun.' " "Troy made no comment," Barbara testified, adding, "[H]e walked away because . . . see, he didn't agree upon at that time about it."

### 5. *Defendant's exclamations as to his intent to kill Carolyn Grayson*

In early December 1981, Grayson's neighbor, Tommie Garcia, observed an altercation between defendant and Grayson. Garcia testified: "Well, Troy was hitting Carolyn with a tire iron, and she was under the truck when I came out, under my boyfriend's truck. And she was way underneath, and he was hitting her, and she kept screaming at him, you know, 'Troy'—'she kept saying, 'I won't hurt you, Troy, I won't do anything to hurt you, Troy, leave me alone, I won't say anything.' And Troy kept trying to get her out. He'd move this way, and she'd go the other way, he'd go the other way, she'd move the other way, and Tanya was also out there. Some of the neighbors. And he kept saying, he says, 'I'm going to kill that fucking bitch.' He said that. And he said that to Tanya. And I was right behind there, I was looking at everything."

On approximately December 16, 1981, defendant and his brother Marlow had a discussion concerning Grayson. Marlow's testimony (adduced at the preliminary hearing and read at defendant's trial) was that defendant told him: "I gotta get rid of the bitch because she's gonna send me to the gas chamber."

### 6. *The death of Carolyn Grayson*

On December 22, 1981, Sauda was present in the apartment she shared with her mother. Defendant arrived that morning, bearing a television set

that Sauda recognized as having belonged to Janet Benner, and which Sauda had seen at the residence of a friend of Grayson. Grayson departed with defendant and, according to Marlow's testimony, went with defendant to a pawnshop. Marlow testified that defendant told him: " 'I took her to a pawnshop. And we was saw together' or seen, 'and that is a good alibi.' " (Later in the trial, defendant corroborated Marlow's testimony, testifying that he (i.e., defendant) and Grayson went to a pawnshop in the late afternoon of December 22, and that he then "took Carolyn back home.") Marlow acknowledged that, in an earlier interview with a Fresno detective investigating the case, he had said that defendant told Marlow he had wanted to be seen with Grayson at certain places in order to establish an alibi.

Over defendant's hearsay objection, Grayson's daughter Sauda testified that, after her mother's return to their apartment in the early evening of December 22, 1981, Grayson informed her that she was leaving that night to go "to Oakland with Troy." Over defendant's further objection (that the prosecutor was "leading the witness"), Sauda testified that her mother told her "if she didn't come [back] I [was] to call my Aunty Bobbi."[4]

On December 23, 1981, at approximately 4 a.m., Tommie Garcia heard the drunken laughter of defendant, Emanuel Corners (defendant's brother-in-law), and defendant's wife Tanya, as they ascended the apartment stairs near Garcia's residence. Garcia testified that she had seen defendant and Corners leave the apartment complex at approximately 7:00 the previous evening. Garcia was expecting Tanya to visit her later that day, but Tanya did not arrive, and thereafter Garcia's relationship with Tanya changed. According to Garcia, Tanya "was always crying after that or—she changed. She wouldn't visit me no more, she wouldn't talk, she would just come over and use the phone, and that's it."

Later on December 23, at approximately 8:30 a.m., Grayson's supine body was found 62 miles from her Fresno residence, in an alfalfa field near Los Banos, in Merced County. Grayson's sweater was pushed up to mid-chest level, and her pants and underwear were pulled down, exposing her genital area, although there was no evidence of sexual assault. She had been shot six times in the upper body area. Dr. George Mansur, a Merced County pathologist who conducted an autopsy on Grayson's body the day it was found, testified that she died from massive internal bleeding caused by gunshot wounds that penetrated her heart and right lung. He estimated that death occurred between 2 p.m., December 22, 1981, and 6 a.m. the following morning.

---

[4]Defendant's motion for a mistrial, based upon the purportedly leading nature of the questions posed to Sauda, was denied by the trial court.

Physical evidence identified at the murder scene indicated that Grayson had been shot on Cozzi Road and that her body thereafter had been dragged more than 50 feet into the alfalfa field. Law enforcement officials investigating her death discovered bloody drag marks leading from the road, three spent .38-caliber bullets, and gouges in the blacktop pavement that appeared to have been made by bullets. Grayson's keys—which included keys that fit defendant's vehicle—were found in this area, and her purse was retrieved approximately 25 feet from her body. Subsequently, inside the trunk of defendant's vehicle, law enforcement officials found woman's clothing and a purse containing papers bearing Grayson's name.

### 7. The handgun evidence

In its opening statement to the jury, the prosecution acknowledged that the handgun used in Grayson's murder "has never been found," but promised to introduce evidence that showed defendant possessed a .38-caliber handgun. Thereafter, in its case-in-chief, the prosecution introduced evidence that Grayson was fatally shot with a .38-caliber revolver. John Hamman, a criminalist employed by the California Department of Justice, testified that, based upon his examination of the spent bullets recovered from the crime scene, an Arminius "Titan Tiger" was one of several weapons that could have fired the fatal bullets. Gregory Ninnis, a pawnbroker at Federal Jewelry and Loan, testified that on January 5, 1981, an individual who identified himself as "Don Ray Hill" pawned a .38-caliber Arminius Titan Tiger, and reclaimed the weapon the following day. The same person pawned an Arminius Titan Tiger on January 26, 1981, reclaiming the item from pawn five days later. On February 11, 1981, a Don Ray Hill pawned another .38-caliber revolver, an R.G. "Model 40," reclaiming it on February 28, 1981. Jerry Owens, a handwriting expert employed by the Fresno Police Department, testified that, according to police reports he had been furnished, "Don Ray Hill" and "Troy Lee Jones" were the same person, a circumstance substantiated by his comparison of handwriting exemplars.

### B. The defense case

The defense presented the testimony of several individuals, including that of defendant himself, to establish that certain prosecution testimony had been tainted by bias and that, because other members of defendant's family—defendant's wife (Tanya Jones), his sister (Barbara Jones), and his mother (Margaret Payne)—previously had plotted and attempted to kill Grayson, one or more of them likely perpetrated Grayson's murder.

Kenneth Pierce, a Merced County sheriff's detective, testified that, as part of his investigation into Grayson's murder, he conducted an interview of

Barbara Jones, during which Barbara admitted that, at the request of Margaret Payne, Barbara had furnished Grayson pills that were adulterated with lye. On cross-examination, the prosecution played the entire tape recording of the interview, which included Barbara's account of the Thanksgiving Day plot to kill Grayson, as well as Barbara's statement that defendant's wife Tanya "mentioned that she [Tanya] . . . would kill [Grayson] . . . but Troy wouldn't let her." On redirect examination, Pierce testified that Barbara informed him that Payne once had killed a 17-year-old boy by forcing him to consume pills. In response to defense counsel's inquiry as to whether Barbara mentioned to Pierce that defendant had killed another man, Pierce stated he believed Barbara had so informed him.

As to events near the time of Grayson's murder, defendant testified that, after driving with Grayson and Emanuel Corners to the pawnshop on the afternoon of December 22, 1981, where they unsuccessfully attempted to pawn a television set, he took Grayson back to her residence (never seeing her alive again), after which he and Corners went to a liquor store and a restaurant, sold the television set to a passerby for $15, purchased gas at a service station, dropped off a tire at another destination for repair, visited defendant's mother, picked up the tire, went to an establishment called "The Hole-in-the-Wall," patronized a pool hall, visited an acquaintance, then went to his mother-in-law's residence at approximately midnight. Defendant added that, shortly before 2 a.m., he accompanied his wife Tanya and his brother Marlow to a 7-Eleven store to buy beer, returning to his apartment a few minutes later. He denied returning to the residence at 4 a.m., as Tommie Garcia had testified.

Defendant testified that he had not been acquainted with Janet Benner and never had been inside her apartment. He testified he pawned the adding machine after seeing it in his mother's garage. He denied knowing anything about the deaths of Janet Benner and Carolyn Grayson, denied leaving Fresno on the evening of December 22, 1981, and denied ever owning a .38-caliber handgun or shooting anyone. He testified that he had pawned two .38-caliber weapons, one belonging to his father, Richard Jones, the other belonging to an acquaintance named "Frisco" (occasionally referred to at trial as "Clarence Warren"). The defense introduced into evidence the handgun that belonged to defendant's father. On cross-examination, defendant acknowledged that he had used one of several aliases in pawning the guns, and that he had suffered prior felony convictions for burglary and receiving stolen property.

Marjorie Scott, defendant's mother-in-law, testified that she had purchased furniture from Grayson. On cross-examination, the prosecutor inquired whether defendant ever had shot Scott. Over an unsuccessful objection as to relevancy, she testified that in the course of an argument between

Scott and her husband, defendant shot her in the face. On redirect examination, Scott explained that the gun discharged when defendant attempted to separate her from her husband. On recross-examination, Scott characterized the incident as an "accident," one that she "really [did not] remember how it happened," because she "was heavily under alcohol."

Defendant's brother Marlow, who was unavailable to testify during the prosecution's case-in-chief, appeared as a witness for the defense and testified that, prior to Marlow's providing testimony at defendant's preliminary hearing, law enforcement officials informed him: " 'If you can help us get [defendant] on this one . . . then it would be worth $10,000.' And it's coming from some lady's daughter, or something." Marlow added that the officers' inducement to testify left him feeling "under a lot of pressure," that his parole officer "told me I'd better cooperate and do everything they tell me to do" and that if he (Marlow) refused to cooperate, the parole officer "said he's going to violate me." On cross-examination, Marlow similarly accused the prosecutor of telling him what to say at the preliminary hearing, adding that he (Marlow) was angry with defendant, a circumstance that contributed to his testifying against his brother at the preliminary hearing. Contradicting the testimony he gave at the preliminary hearing, Marlow denied hearing Grayson describe defendant's involvement in the killing of Janet Benner.

After defense counsel informed the trial court that certain defense witnesses had not appeared at the courthouse, the trial court permitted the prosecution to call one of its rebuttal witnesses out of order so as not to unduly prolong the trial. Neil Manha, a detective employed by the City of Fresno, testified over a relevancy objection interposed by the defense that he had met defendant on March 9, 1981, more than nine months prior to the killing of Grayson, while Manha was working as a uniformed police officer and responding to a report of a confrontation at a residence. According to Manha, defendant informed him at that time that he was upset because he had purchased cocaine with a street value of $300, but had found it "very impotent" and wanted his money back from the seller, Frisco. Manha testified that defendant had confronted Frisco at the latter's apartment; there had been an altercation, and, upon the arrival of the police, law enforcement officers confiscated three loaded handguns. These handguns were an RG-31 .38-caliber five-shot revolver (exhibit No. 46), a Colt .22-caliber semiautomatic handgun (exhibit No. 47), and an RG-40 .38-caliber revolver (exhibit No. 48). (The Titan Tiger .38-caliber handgun [defendant's exhibit B], owned by defendant's father, was not among the weapons confiscated by the police at Frisco's apartment.) Over a relevancy objection interposed by the defense, the trial court admitted into evidence the three handguns confiscated by the police. On cross-examination, Manha acknowledged that none

of the handguns, or any other weapon, had been found in defendant's possession on that earlier occasion.

Lois Sortor, an acquaintance of Carolyn Grayson, thereafter testified for the defense that, on the evening of December 22, 1981, she observed Grayson enter a pawnshop in downtown Fresno with a black-and-white television, then emerge from the pawnshop and enter a black Cadillac driven by "a white guy." On cross-examination, Sorter contradicted the foregoing testimony she had given on direct examination, acknowledging she could not recall the day she observed Grayson at the pawnshop.

The final witness called by the defense was John Hamman, the criminalist who had testified during the prosecution's case-in-chief as to the types of firearms that might have fired the spent bullets recovered from the crime scene. Hamman testified that no one ever requested that he examine whether the evidence recovered matched the handguns marked by the prosecution as exhibits. He eliminated exhibit No. 47, the Colt .22-caliber semiautomatic handgun, as a weapon that possibly might have fired the .38-caliber ammunition recovered from the crime scene. At the request of the defense, the trial court ordered Hamman to conduct such an investigation immediately as to the three .38-caliber weapons that had been marked exhibits No. 46, 48, and defendant's exhibit B. Later that day (in the midst of the prosecution's presentation of its case in rebuttal), the court informed the jury of a court clerk's message it had received, which read: " 'John Hamman called. He has eliminated all three weapons, and he wants to know if you want him to return,' and I [the trial court] told him not to return since he couldn't make any connection evidently between the three weapons and the shells."

## C. *Rebuttal*

The prosecution recalled Detective Kenneth Pierce to rebut the defense theory that certain witnesses had fabricated testimony suggesting that defendant had participated in a plan with members of his family to kill Grayson. Over objection by the defense, the jury heard portions of a tape-recorded interview of defendant's sister Joanne conducted by Pierce on April 12, 1982, as part of the police investigation into Grayson's death. Joanne informed Pierce: "The only thing I can say is that my ma said she had to go. . . . She said, 'Joanne, it is either Troy's life or her life. . . .' She had us to come out there one night to kill her. She had Barbara and myself one night to come out there to bring some pills, we went off to Longs—Drug Fair, got some of that Drano, we put some Drano inside of a capsule to give to mom, then we gave it to my mother. Carolyn had just left, so my mom told me, said, 'Well, I'll take care of this.' . . . I did not see her take the

drug. If she would have been there, I would have gave her the pills, because my mom had told us to give her the pill. . . ."

The prosecution also sought to recall defendant's brother Marlow, who had testified on behalf of the defense the previous day and had not been excused. Marlow, however, could not be located within the courthouse. The prosecution requested that the trial court declare Marlow to be unavailable as a witness and permit portions of his preliminary hearing testimony to be read to the jury. The defense objected on the ground it was unfair to require a witness to "show up in two minutes." The trial court observed that, on the previous day, Marlow "was told to remain in the courthouse . . . ." Defense counsel inquired of the trial court: "You expected him to be out there [in the courthouse hallway] last night?" "All night, yes," the trial court replied, overruling the objection and permitting Marlow's testimony to be read to the jury. In that testimony, Marlow stated that, five to seven days after Marlow learned of Grayson's death, Emanuel Corners told him: " 'I helped him carry the bitch in the field,' but he didn't say no names." Marlow also stated Corners told him, " 'I should have threw the gun in the lake instead of the pond.' " (As noted, the prosecution did not introduce the weapon that killed Grayson.)[5]

The jury returned a verdict finding defendant guilty of the first degree murder of Grayson, also finding true the allegation that he used a firearm during the commission of the murder as well as the special circumstance that the crime was committed for the purpose of preventing Grayson from testifying in a criminal proceeding.

## II. *Penalty Phase*

### A. *The prosecution's case-in-aggravation*

The prosecution did not present any additional evidence at the penalty phase.

### B. *The defense case-in-mitigation*

Defendant, the only witness called as part of the defense case-in-mitigation, testified briefly as to his background, and to the circumstances relevant to the present case, informing the jury that he was 31 years of age at the time

---

[5]Although Marlow's testimony indicated that Corners was involved in the murder of Grayson, the record reveals that one week after the conclusion of defendant's trial, the trial court granted the prosecution's motion to dismiss murder charges against Corners, on the grounds of "unavailability of material witnesses and thus the insufficiency of the evidence."

of trial, the second of 5 children born out of wedlock and raised in a fatherless home, and a high school dropout who took a dishwashing job at approximately age 16 to help his mother pay the family's expenses. He characterized the relationship between himself and his siblings as one filled with hatred, and stated that he often assumed the roles of peacemaker and disciplinarian. Beginning in 1978, defendant became addicted to heroin and cocaine. Although married to Tanya, defendant explained that the victim Grayson had been his girlfriend during the months preceding her death, and that he and Grayson had maintained "a beautiful relationship." He similarly characterized his friendship with Grayson's children. Defendant acknowledged, however, that he and Grayson quarreled frequently, explaining that he could not understand why she began to engage in acts of prostitution— conduct that led to the deterioration of their relationship. Defendant expressed grief over Grayson's death and regret that Janet Benner had died, adding that he and Benner never had met.

On cross-examination, defendant acknowledged having pled guilty to committing a burglary in Texas.

At the conclusion of the penalty phase, the jury returned a verdict imposing the death penalty, and the trial court entered a judgment of death.

## DISCUSSION

Defendant urges numerous grounds for reversal of the judgment as to guilt. In the accompanying matter, *In re Jones, supra,* 13 Cal.4th 552, we conclude that the judgment must be vacated in its entirety on the ground that the representation provided by defendant's trial counsel was so deficient as to deprive defendant of his constitutional right to the effective assistance of counsel. Because the judgment must be reversed in its entirety upon the basis of the claims raised in the habeas corpus proceeding, we shall dismiss defendant's appeal as moot. As noted, we shall address in this opinion certain issues that appear likely to recur upon retrial, but we need not, and do not, discuss other issues raised by defendant.

I.   *Guilt Phase Issue*

*The admissibility of Sauda Smith's testimony that Carolyn Grayson told her she was going to Oakland with defendant and to call "Aunty Bobbi" if she did not return*

As set forth in the statement of facts, Carolyn Grayson's daughter, Sauda Smith, testified in the prosecution's case-in-chief that her mother left

their residence on the evening of December 22, 1981. Over defendant's objection, on the grounds the inquiry was leading and sought to elicit a hearsay and untrustworthy response, Sauda further testified that, as Grayson left their residence, she told Sauda she was going to "Oakland with Troy," and that "if she didn't come back . . . to call . . . Aunty Bobbi." Defendant makes three arguments in support of his contention that the trial court erred in admitting Sauda's testimony as to her mother's statement.

First, defendant contends that Sauda's testimony as to Grayson's statement should have been excluded on the ground that Grayson's extrajudicial statement to Sauda constituted inadmissible hearsay. (Evid. Code, § 1200.) In this regard, defendant acknowledges that Grayson's statement was admissible under this court's decision in *People* v. *Alcalde* (1944) 24 Cal.2d 177 [148 P.2d 627], but argues that that case was wrongly decided and should be overruled. Subsequent to our decision in *Alcalde*, however, the Legislature enacted Evidence Code section 1250, which provides in relevant part that "evidence of a statement of the declarant's then existing state of mind . . . is not made inadmissible by the hearsay rule when . . . [t]he evidence is offered to prove or explain acts or conduct of the declarant." The legislative history of section 1250 makes it clear that this provision specifically was intended, in part, to codify the *Alcalde* decision. (See, e.g., *People* v. *Chambers* (1982) 136 Cal.App.3d 444, 452-453 [186 Cal.Rptr. 306] [citing and quoting the report of the California Law Revision Commission].) Accordingly, because the Legislature has determined that a statement of a declarant's state of mind, such as that here at issue, is not inadmissible under the hearsay rule when offered to prove conduct of the declarant in conformity with that state of mind, we have no occasion or authority to reconsider the *Alcalde* decision.

Second, defendant contends that even if Grayson's statement to Sauda falls within the provisions of Evidence Code section 1250, the statement nonetheless should have been excluded under the provisions of Evidence Code section 1252, which provides that "[e]vidence of a statement is inadmissible under this article [including section 1250] if the statement was made under circumstances such as to indicate its lack of trustworthiness." Defendant contends that, because Grayson was a prostitute who typically went out at night, never informing her daughter of her whereabouts or the reason for her departures, Grayson had a motive to be untruthful in informing Sauda of her plans, and therefore Grayson's statement failed to satisfy the "trustworthiness" requirement set forth in Evidence Code section 1252.

Nothing in the record, however, suggests Grayson spoke dishonestly to her daughter, or had a motive to fabricate her stated destination on the night

of the murder. To the contrary, because Grayson typically did not inform Sauda as to her destination, but did so on December 22, 1981, there is a reasonable basis to infer that Grayson wanted Sauda to know where she was going, and with whom. Because Grayson's statement to Sauda on the night of the murder appears to have been " 'made in a natural manner and not under circumstances of suspicion, [it] carr[ies] the probability of trustworthiness.' " (*People* v. *Hamilton* (1961) 55 Cal.2d 881, 895 [13 Cal.Rptr. 649, 362 P.2d 473], overruled on other grounds in *People* v. *Wilson* (1969) 1 Cal.3d 431, 442 [82 Cal.Rptr. 494, 462 P.2d 22]; see also *People* v. *Pinn* (1971) 17 Cal.App.3d 99, 106 [94 Cal.Rptr. 741].) We therefore reject defendant's contention that the trial court should have excluded Sauda's testimony on the basis that Grayson's statement was made under circumstances indicating its lack of trustworthiness.

Third, defendant contends that, even if the trial court properly admitted into evidence that portion of Sauda's testimony describing Grayson's plans, the court erred in admitting Grayson's instructions to Sauda that "if she didn't come back I am to call my Aunty Bobbi." According to defendant, the effect of this testimony was to imply strongly that Grayson was in such fear of defendant as to cause her to believe she might never return from her rendezvous with him.

Nothing contained in Grayson's statement to Sauda, however, indicates that Grayson suspected (or intended to convey the impression) that she might *never* return from her trip to Oakland with defendant, and, in our view, the statement is at least equally susceptible to the innocuous interpretation that Grayson simply instructed her daughter to call her Aunt Bobbi in the event Grayson failed to return to Fresno *that night*. In objecting at trial to the admission of the foregoing evidence, defense counsel did not suggest that this portion of the statement should be excluded because the jury reasonably might interpret Grayson's statement to Sauda as a declaration that Grayson feared defendant intended to kill her that night.

Accordingly, we conclude that the trial court did not err in admitting Sauda's testimony as to the statement made by Grayson to Sauda when Grayson left their residence on the night of December 22, 1981.

II. *Special Circumstance Issue*

*Whether the trial court erred in failing to instruct the jury that the special circumstance of murder of a witness is applicable only where the victim was an eyewitness to a prior crime*

The trial court instructed the jury pursuant to CALJIC No. 8.81.10, the standard jury instruction applicable to the special circumstance of the

intentional killing of a witness. That instruction, which closely followed the language set forth in section 190.2, subdivision (a)(10), stated in pertinent part: "To find that the special circumstance, referred to in these instructions as murder of witness to crime, is true, each of the following facts must be proved: [¶] 1. That the person killed was a witness to a crime, and [¶] 2. . . . That the witness was intentionally killed for the purpose of preventing his [her] testimony in a criminal proceeding, and [¶ . . . 3. That the killing was not committed during the commission or attempted commission of the crime to which the person killed was a witness."

Defendant contends the special circumstance finding must be set aside because the trial court failed to instruct the jury that the special circumstance is applicable only where the victim was an *eye*witness to a crime. According to defendant, the term "witness" as used in a criminal proceeding has a considerably broader definition than the term "eyewitness," and because section 190.2, subdivision (a)(10), refers to "witness to a crime," the Legislature must have intended that the special circumstance be limited to victims who actually observed at least a portion of the commission of the crime— i.e., "*eye*witnesses."

In previous decisions, we implicitly have rejected arguments similar to defendant's contention. In *People* v. *Allen* (1986) 42 Cal.3d 1222 [232 Cal.Rptr. 849, 729 P.2d 115], we upheld a judgment of death after a jury found true a special circumstance that was supported by evidence that the murder was committed both for the purpose of preventing testimony by the victim and in retaliation for prior testimony. In *Allen*, the victim had not been an eyewitness to a burglary, but had received information implicating the defendant in that crime, had testified against the defendant, and thereafter was killed in retaliation for having provided such testimony and because the defendant believed that he could prevail on appeal and at retrial if the witness were killed. (*Id.* at pp. 1236-1244, 1273-1274; see also *People* v. *Weidert* (1985) 39 Cal.3d 836, 853 [218 Cal.Rptr. 57, 705 P.2d 380] ["[I]f an accused believes himself to be exposed to criminal prosecution and intentionally kills *another* to prevent that person from testifying in an anticipated or pending criminal proceeding, the special circumstance may be found true . . . ."] [italics added].) Thus, nothing in the language of the applicable special circumstance or in our decisions applying this special circumstance supports the suggestion that the special circumstance is confined to the killing of an "eyewitness," as opposed to any other witness who might testify in a criminal proceeding.

Accordingly, we reject defendant's challenge to the adequacy of the jury instruction given.

## Disposition

In the companion habeas corpus proceeding, *In re Jones, supra*, 13 Cal.4th 552, we conclude that the underlying judgment must be vacated in its entirety on the ground of ineffective assistance of counsel. Accordingly, the appeal is moot and is dismissed.

Mosk, J., Kennard, J., Werdegar, J., Chin, J., Lillie, J.,* and Lucas, J.,† concurred.

---

*Presiding Justice of the Court of Appeal, Second Appellate District, Division Seven, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

†Retired Chief Justice of the Supreme Court, assigned by the Acting Chief Justice pursuant to article VI, section 6 of the California Constitution.