David STEVENSON, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

No. 32, 1997, 67, 1997.

Supreme Court of Delaware.

Submitted: Feb. 24, 1998.
Decided: April 14, 1998.
Rehearing Denied May 5, 1998.

Leo John Ramunno, Wilmington, for appellant.

Timothy J. Donovan, Jr. (argued), William E. Molchen and Thomas E. Brown, Deputy Attorneys' General, Wilmington, for appellee.

Before VEASEY, C.J., WALSH, HOLLAND, HARTNETT, and BERGER, JJ. (constituting the Court en Banc).

HOLLAND, Justice.

This is an appeal after a capital murder trial and penalty hearing where the defendant-appellant, David D. Stevenson ("Stevenson"), was sentenced to death. On November 13, 1995, Stevenson and his co-defendant, Michael Manley ("Manley"), were arrested and charged with the murder of Kristopher Heath ("Heath"). Heath's death had occurred earlier that day. After a joint trial in the Superior Court, a jury found both Manley and Stevenson guilty of Murder in the First Degree and related offenses.[1] The State

---

1. On December 18, 1995, the Grand Jury returned a six-count indictment: Murder in the First Degree, Conspiracy in the First Degree, Aggravated Act of Intimidation, Conspiracy in the Second Degree and two counts of Possession of a Firearm During the commission of a Felony. Each defendant was found guilty on all six counts.

Count I of the indictment, which charged Murder in the First Degree, alleged that "Michael Manley and David Stevenson, on or about the 13th day of November, 1995, in the County of New Castle, State of Delaware, did intentionally cause the death of Kristopher Heath, by shooting him with a handgun."

then sought the death penalty for both defendants.

At the penalty phase of their joint trial, eight members of the jury voted to recommend the death penalty for Stevenson and four members voted against that recommendation.[2] By a vote of seven to five, the same jurors also recommended that Manley receive a death sentence. The Superior Court sentenced both Stevenson and Manley to death by lethal injection.[3] An automatic appeal of each death sentence was docketed with this Court pursuant to 11 *Del. C.* § 4209(g) and Supreme Court Rule 35.[4]

In this Court, Stevenson's automatic appeal was consolidated with Stevenson's separately filed direct appeal. Stevenson has raised five contentions, which he submits require his convictions to be reversed. First, he argues that the Superior Court abused its discretion by failing to grant his motion for severance. Stevenson argues that he was prejudiced because his defense and that of his co-defendant, Manley, were mutually antagonistic. Second, Stevenson contends that the Superior Court abused its discretion by denying his motion for a continuance on the morning of jury selection, so that the private attorney his family had retained could represent him at trial. Third, Stevenson contends that the Superior Court abused its discretion in finding that his pending felony theft charges were admissible under an·exception to the prohibition on admission of "other· crime" evidence. Fourth, Stevenson contends that the State made improper statements to the jury by expressing the prosecutor's personal opinions and beliefs during closing argument. Fifth, Stevenson contends that the Superior Court erred in its instruction to the jury on accomplice liability, by not requiring the jury to determine which co-defendant was the accomplice and which was the principal.

Stevenson also argues that his sentence of death must be reversed by this Court for three reasons: First, he asserts that the Superior Court erred in finding that the evidence established the existence of certain statutory aggravating circumstances. Second, Stevenson contends that the imposition of the death penalty in his case was arbitrary and capricious. Third, Stevenson submits that the imposition of his death sentence was disproportionate to the penalty imposed in similar cases.

This Court has reviewed each of Stevenson's contentions regarding the guilt phase of his trial. We have also reviewed his sentence of death, as required by the Delaware Death Penalty Statute. We have determined that the arguments raised by Stevenson, challenging the judgments entered after both the guilt and the penalty phases of his trial, are without merit. We have also concluded that the Superior Court's decision to sentence Stevenson to death by lethal injection should be affirmed.

## FACTS

The defendants' joint trial commenced on October 30, 1996, and concluded on November 12, 1996. The facts, as set forth in this opinion, are taken primarily from the findings in the Superior Court's written decision following the guilt phase of Stevenson's trial and the subsequent penalty hearing. *See State v. Manley,* Del.Super., No. 951107022, Barron, J., 1997 WL 27094 (Jan. 10, 1997)

---

A person who intentionally causes the death of another person is guilty of Murder in the First Degree in violation of 11 *Del. C.* § 636(a)(1).

**2.** More precisely, the jurors answered two questions, as required by Section 4209: first, whether at least one *statutory aggravating circumstance* existed beyond a reasonable doubt; and, second, whether, after weighing all the aggravating and mitigating evidence, the aggravating circumstances outweighed the mitigating circumstances by a preponderance of the evidence. 11 *Del. C.* § 4209(c). In Stevenson's case, the jurors answered the first interrogatory in the affirmative by a unanimous vote, with regard to the exis-

tence of four separate statutory aggravating circumstances. Those same jurors responded to the second interrogatory with eight affirmative votes and four negative votes.

**3.** The Delaware Death Penalty Statute directs the Superior Court judge to consider the "recommendation of the jury," and conduct his or her independent determination before deciding the appropriate sentence. 11 *Del. C.* § 4209(d).

**4.** Manley was also sentenced to death. His appeal is addressed by this Court in a separate opinion.

(Findings After Penalty Hearing). Before announcing its sentences, the Superior Court determined that to put this case into a proper perspective, it had to begin with a recitation of the events that had occurred during September 1994, more than a year prior to the murder of Heath. This opinion also begins with those 1994 actions.

### Macy's Thefts

On September 30, 1994, Stevenson was arrested by Detective Thomas Ford of the Delaware State Police in connection with the fraudulent use of credit cards to purchase Macy's gift certificates.[5] Stevenson had been employed by Macy's and worked in the ladies shoe department when these purchases were made. In making the arrest, Detective Ford relied upon information supplied to him by, among others, Parminder Chona ("Chona") and Heath, who were both employed by Macy's as security officers. Their investigation of the Macy's internal theft culminated in Stevenson confessing to the thefts.

In February 1995, Stevenson was indicted on nine counts of felony Theft and nine counts of felony Unlawful Use of a Credit Card. Four of the thefts occurred on September 2, 1994; five of the thefts occurred on September 15, 1994. Each theft was in the amount of $500, for a total of $4,500.

On April 1, 1995, Stevenson's attorney filed with the Superior Court a Motion to Suppress. This motion sought to suppress all statements which Stevenson had given to agents of Macy's department store on September 30, 1994. Stevenson's attorney argued that his statement was not given voluntarily. The Superior Court held a suppression hearing on August 23, 1995. The presentation of the evidence included testimony from Chona and Heath. The Superior Court concluded that Stevenson's September 30, 1994 statement to the Macy's security personnel was voluntary. Accordingly, the Motion to Suppress was denied.

The theft case against Stevenson was originally set for trial on April 12, 1995. After four continuances, the trial was rescheduled for November 13, 1995. Two of the witnesses subpoenaed to testify on November 13, 1995, were Chona and Heath.

### The Murder

The Superior Court concluded the credible evidence established that Stevenson and Manley left Stevenson's Wilmington residence on November 13, 1995, at approximately 6:45 a.m.[6] They were in a vehicle, jointly owned by Stevenson and his sister. That vehicle was distinctive in appearance because its dark blue paint had peeled off in many places, leaving silvery splotches in all such locations. A gold and red tassel hung from the rearview mirror. The vehicle was a 1989 Mercury Topaz with Delaware license number 727970.

At approximately 7 a.m., Michael Chandler ("Chandler") was leaving for work when he observed the "distinctive" vehicle in a parking lot at the Cavalier Country Club Apartments. The vehicle was occupied by two black males. Chandler noticed that the driver was wearing a dark winter wool hat. Chandler was suspicious because both men seemed to be slouching in their seats. Chandler testified that he recalled seeing the gold and red tassel hanging from the rearview mirror. Chandler lived in Building 10B, Capano Drive.

A number of the State's witnesses testified that they heard gunfire at approximately 7:40 a.m. These witnesses were all tenants of the buildings surrounding the parking lot at the Cavalier apartment complex. Their

---

5. At the murder trial, which is the subject matter of this appeal, the Superior Court ruled that the Macy's theft evidence was admissible to show identity and motive, pursuant to D.R.E. 404(b) and 403. *See Getz v. State,* Del.Supr., 538 A.2d 726 (1988). A limiting instruction was included in the Superior Court's final instructions to the jury.

6. Mario Cruz ("Cruz"), the boyfriend of Stevenson's mother, Delphine Brown, told the police on November 13, 1995, that Stevenson and Manley left Stevenson's house around 6:45 a.m. on that date. At trial, Cruz testified it was approximately 7 a.m. when Stevenson and Manley left. The Superior Court found that Cruz's in-court testimony was less credible than the initial statement he had given to the police.

descriptions of what they saw varied. Two witnesses, Susan Butler ("Butler") and Philip Hudson ("Hudson"), testified that they saw a stocky black man wearing a dark blue sweatshirt or jacket and dark pants or blue jeans running across the parking lot immediately after hearing the gunfire.[7] This description matched Manley, who was wearing a dark blue pullover shirt and blue jeans when he was apprehended.

The witness called by the State who had the best vantage point at the time of the shooting was Lance Thompson ("Thompson"). He lived in a third floor apartment. When he heard four to six shots of gunfire, Thompson ran to his window which looked out over the parking lot. He saw a man get into the passenger side of the suspect vehicle. The vehicle, which had paint peeling off its top, backed up towards his apartment building and then exited the parking lot. Thompson had a clear look at the license number. He immediately wrote it down on a piece of paper so he would not forget the number.

Thompson exited his building and told Patrolman Daniel Meadows of the New Castle County Police Department that he had written down the vehicle's license number. Patrolman Meadows, who had just arrived at the scene, took the piece of paper and immediately had the number broadcast by the police dispatcher. That automobile license number was Delaware 727970. Patrolman Meadows gave the piece of paper back to Thompson following the broadcast.[8] The tag number was checked in the motor vehicle records. Those records showed the registered owner's address as being 206 West 20th Street, Wilmington, Delaware. This information was also broadcast by the police dispatcher.

### The Apprehension

Shortly after 8 a.m., Officers Murray, Witte, Danese and Stark of the Wilmington Police were dispatched to the area of Stevenson's residence, at 206 West 20th Street in the City of Wilmington. Upon arrival, Officer Murray exited his police vehicle and approached on foot two black men who were exiting the suspect vehicle. When the two men turned in Officer Murray's direction and saw him, they immediately got back into the Mercury Topaz and sped off. The vehicle turned left on Washington Street and then right on West 19th Street, heading down that street the wrong way. The vehicle jumped the curb on West 19th Street and sustained a flat tire.

The two men then led the police on a short foot chase. One of the men was apprehended after running out of an alley onto Washington Street, between West 18th Street and West 19th Street. This was Manley. The other man ran to the corner of West 18th Street and Baynard Boulevard where he boarded a bus. The police boarded the bus, located the suspect and removed him from the bus. This was Stevenson.

Both suspects had cuts on the palms of their hands and were breathing heavily. Stevenson was sweating. Manley was wearing a dark blue pullover shirt with an open collar and with three buttons at the top and blue jeans. Stevenson was wearing a dark green sweatshirt and blue jeans.

Following the arrests and before Stevenson was turned over to the New Castle County Police, the police placed Stevenson in Officer Danese's patrol vehicle. After his shift was over, Officer Danese inspected the interior of his patrol vehicle, according to normal police procedure. On the floor of the rear passenger space, in the area where Stevenson had been sitting, Office Danese found a piece of paper. Chona's name, address and phone number were written on this piece of paper.

The Mercury Topaz was impounded and removed to the New Castle County Police Headquarters. After the police obtained a search warrant, they searched the vehicle for evidence. From the trunk, the police retrieved a camouflage Army jacket with a

---

7. Hudson noted that the man he saw was wearing a baseball cap and white sneakers. At the time of Manley's apprehension, he was wearing sneakers which were mostly white. At the time of Stevenson's apprehension, he was wearing black sneakers.

8. Thompson did not keep the piece of paper.

Specialist E4 insignia on it. From a pocket of this jacket, the police retrieved 24 copper-jacketed 9 mm live rounds of ammunition. The live rounds were of the same type and from the same manufacturer as the cartridge cases recovered from the scene of the murder.

### State's Other Evidence

On the evening of November 12, 1995, Debbie Dorsey ("Dorsey"), was at the Cavalier Country Club apartment which she shared with Heath. At 7 p.m. or so, there was a knock at her door. She opened the door and observed a black man who asked whether Heath was home. She responded that he was not in but was expected to return at around 9 p.m. She had never seen this man before. He was wearing a puffy, black jacket and was a little shorter than Heath.[9] Dorsey knew Stevenson since she also worked at Macy's department store. She was sure it was not Stevenson even though the lighting was not very good. She had never met Manley.

In October 1994, Melissa Magalong had moved into the Newark residence where Heath used to live. At around 8 p.m. to 9 p.m. on November 12, 1995, she heard a knock on her door. She did not answer the door, although she heard male voices mumbling outside. The men went away.

The State also introduced evidence that Manley and Stevenson were together on the night before the murder. According to Anna Hawley, who was employed at the University of Delaware library, Stevenson worked at the library from 9 p.m. to midnight on the evening of November 12, 1995. She saw Stevenson with his friend, Manley, together at some point during Stevenson's shift. Janet Hedrick, an officer with the University of Delaware Police, saw Manley waiting for Stevenson at the library at around 11:45 p.m. He also saw Kevin Powlette ("Powlette"), Manley and Stevenson together after midnight on the morning of November 13, 1995.

The weapon used to murder Heath was never recovered. According to the State's evidence, about one week prior to the murder, Stevenson told his friend, Powlette, that he wanted to get a gun for his protection. Atomic absorption tests performed on the defendants' hands and clothing showed no traces of gunshot reside.

Agent Ron Dodson of the Bureau of Alcohol, Tobacco, and Firearms explained that a revolver is much more likely to leave gunshot residue than a semi-automatic. He also stated that there is less likelihood of gunshot residue being detected when a firearm is fired outside rather than inside. He further stated that the passage of time and intervening activity decreases the possibility of a positive result, at least in so far as the hands are concerned. He did say that gunshot residue would remain on clothing until the clothing was washed. Gunshot residue was detected on the jacket which Heath was wearing on the morning of his death.

Specialist First Class Richard Wohlgemuth testified that Manley was a member of his unit of the United States Army Reserve. He identified the jacket taken from Stevenson's vehicle as an Army-issued jacket. The size was extra large regular. According to Manley's Army records, his clothing size was extra large regular. He testified that Manley's rank was Specialist E4.

An agent from the Bureau of Alcohol, Tobacco and Firearms opined that the bullet and copper jacket fragments recovered from the scene and from the body of Heath were all compatible with the components of the copper-jacketed 9 mm Lugar rounds of ammunition recovered from the jacket. He also gave his expert opinion that all of those fragments which he was able to analyze were fired from the same weapon. He was of the opinion that the cartridge cases were all fired from the same semi-automatic weapon.

### Defendants' Trial Evidence

Neither Manley nor Stevenson testified. Both defendants, however, presented witnesses in their defense. Manley's mother, Rita Manley ("Mrs. Manley"), testified that

---

**9.** Heath was 5 feet, 10 inches tall. Detective Craig Weldon testified that Manley is 5 feet, 8 inches tall. There was also testimony that Stevenson appeared to be 3 or 4 inches taller than Manley.

her son graduated from high school in 1992. Thereafter, he joined the United States Army Reserve. She stated that the Army jacket taken from the trunk of Stevenson's car did not belong to her son. Mrs. Manley observed that on most weekends, her son and Stevenson were together. It was also not unusual for him to visit Stevenson at the University of Delaware.

Mrs. Manley recalled that on Sunday, November 12, 1995, Stevenson arrived at her home during the afternoon. He and her son watched a football game on television. According to Mrs. Manley, they left in the evening at around 6 p.m. to 6:30 p.m. to pick up Stevenson's sister, Elissa Brown ("Brown"). Myla Fisher ("Fisher") testified that the defendants were at her house on November 12, 1995, at around 6:45 p.m. to 7 p.m. to pick up Brown, who needed a ride home.[10]

Two cousins, an aunt, a friend of Manley's mother, and a Philadelphia police dispatcher all testified that Manley's reputation for peacefulness was very good. Stevenson's aunt and great aunt also testified as to his reputation for peacefulness. Brown testified as to Stevenson's reputation for peacefulness. She testified that a prior statement to the police, where she said that Stevenson and Manley picked her up at Fisher's house on November 12, 1995, during the first quarter of the Dallas football game, must have been mistaken. She testified that she thought it was at the end of the game because it was dark.

Manley presented testimonial evidence from Dorothy Hackett. She testified by way of video deposition. She was at the Cavalier Country Club Apartments when Heath was murdered. She had identified Stevenson's photograph as the individual she had seen in the parking lot on the morning of November 13, 1995. Hackett also identified Stevenson during the course of her deposition, which both defendants attended. She testified that the person she saw was 5'8" to 5'9" tall, weighed about 160 pounds and was not stocky. She said the person she saw had his shirt sleeves pulled up so that she was able to see his forearms. She said his hands and face were very dark.[11] She described the person she saw as wearing a dark pullover shirt with buttons at the top. This description matched the pullover shirt Manley was wearing when he was apprehended. Hackett described the vehicle as being dark blue with numerous stains which appeared gray or silver. She thought the vehicle was parked facing out of the space and that the person she saw entered the driver's side.[12]

Detective Weldon was called in Stevenson's defense. He investigated whether Stevenson had ever purchased a handgun. He testified that his investigation revealed no evidence that Stevenson had attempted to make a legal purchase of a handgun. Detective Weldon also testified that there was a report during the pursuit of the defendants that a man with a green sweatshirt had been seen entering a church near where Stevenson was apprehended.[13]

### Jury Verdict after Trial

The jury began its deliberations on November 12, 1996. On the afternoon of November 13, 1996, the jury returned verdicts of guilty as to both Manley and Stevenson on all counts in the indictment: Murder in the First Degree, Conspiracy in the First Degree, Aggravated Act of Intimidation, Conspiracy in the Second Degree and two counts

10. The Superior Court noted that on cross-examination, Fisher testified that she had first reported the approximate time of the defendants' visit one to two weeks before trial, although the visit took place almost one year earlier.

11. According to the Superior Court, the record reflects that Manley is far more dark-complected than Stevenson. Hackett agreed that Manley's complexion was darker than Stevenson's complexion.

12. The Superior Court found other evidence clearly suggested that the vehicle was faced into the parking space and had to back out in order to exit.

13. In rebuttal, the State recalled Officer Stark, who testified that the person who went into the church was older than Stevenson and that the sweatshirt was a lighter shade of green that Stevenson's. He also testified that the church was in a direction opposite that in which the chase had occurred.

of Possession of a Firearm During the Commission of a Felony.

### Penalty Hearing and Death Sentence

A penalty hearing was conducted before the same jury for the purpose of making sentencing recommendations with regard to Stevenson and Manley. Testimony was presented by approximately thirty witnesses. After deliberating again, the jury unanimously concluded that four statutory aggravating circumstances existed with regard to each defendant. With regard to Stevenson, the jury concluded by a vote of eight to four that, under the same weighing process, the aggravating circumstances outweighed the mitigating circumstances, With regard to Manley, the jury concluded by a vote of seven to five that, considering both the aggravating and the mitigating circumstances, the aggravating circumstances outweighed the mitigating circumstances. In a forty-four page written opinion, the Superior Court explained the basis for its imposition of a death sentence on Stevenson and Manley. *See State v. Manley,* Del.Super., No. 9511007022, Barron, J., 1997 WL 27094 (Jan. 10, 1997) (Findings After Penalty Hearing).

### Severance Denied
### Discretion Properly Exercised

■ Stevenson's first argument on appeal is that the Superior Court abused its discretion by denying his motion for a separate trial. *See State v. Manley,* Del.Super., No. 9511007022, Barron, J., 1996 WL 527322 (Aug. 1, 1996) (Mem.Op.) (denying Motion For Severance). Stevenson's contention is that his defense and Manley's defense were mutually antagonistic. The existence of mu-

tually antagonistic defenses between co-defendants is a definite factor to be considered and can be determinative in deciding whether a severance should be granted. *Bradley v. State,* Del.Supr., 559 A.2d 1234, 1242 (1989); *Jenkins v. State,* Del.Supr., 230 A.2d 262, 273 (1967). *Cf. Zafiro v. United States,* 506 U.S. 534, 538, 113 S.Ct. 933, 937, 122 L.Ed.2d 317 (1993). In *Bradley,* this Court held that a defendant is entitled to severance when "'the jury can reasonably accept the core of the defense offered by either defendant only if it rejects the core of the defense offered by his codefendant ....'" *Bradley v. State,* 559 A.2d at 1241 (quoting *State v. Vinal,* Conn.Supr., 198 Conn. 644, 504 A.2d 1364, 1368 (1986)). "[T]he presence of hostility between a defendant and his co-defendant or 'mere inconsistencies in defenses or trial strategies,'" however, does not require severance *per se. Outten v. State,* Del.Supr., 650 A.2d 1291, 1298 (1994) (citation omitted). *See Zafiro v. United States,* 506 U.S. at 538, 113 S.Ct. at 937.

■ Under Superior Court Criminal Rule 8(b),[14] two or more defendants may be charged in the same indictment, if they are alleged to have participated in the same act, or in the same series of acts. Ordinarily, when defendants are indicted jointly, they are also tried together. *Jenkins v. State,* Del.Supr., 230 A.2d at 272. If, however, the trial court finds that the joinder of defendants for trial will prejudice any of the parties, it may grant a motion for separate trials. Super. Ct.Crim. R. 14;[15] *Bradley v. State,* 559 A.2d 1234.

■ The decision to grant or deny a motion for severance is addressed to the sound discretion of the trial judge. *Bradley v. State,* 559 A.2d at 1241; *Jenkins v. State,* 230

---

**14.** Superior Court Criminal Rule 8(b) provides:

*Joinder of Defendants.* Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

**15.** Superior Court Criminal Rule 14 provides:

If it appears that a defendant or the state is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trial of counts, grant a severance of defendants or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the court may order the attorney to deliver to the court for inspection in camera any statements or confessions made by the defendants which the state intends to introduce in evidence at the trial.

A.2d at 272; Super. Ct.Crim. R. 14. As a general rule, the factors to be considered when determining whether a motion for a separate trial should be granted are: problems involving a co-defendant's extra-judicial statements; an absence of substantial independent competent evidence of the movant's guilt; antagonistic defenses as between the co-defendant and the movant; and difficulty in segregating the State's evidence as between the codefendant and the movant. *Robertson v. State*, Del.Supr., 630 A.2d 1084, 1093 (1993). *See Jenkins v. State*, 230 A.2d at 273.

The Superior Court denied the pre-trial motion for severance of Stevenson's and Manley's trials in a carefully written opinion, which stated, in part, the following:

> Here, both defendants appear to argue that mutually antagonistic defenses are present in this case because the evidence indicates that only one of them committed the lethal act. Neither defendant gave a statement to the police and neither defendant has proffered to this Court what the core of his defense is. In the final analysis, all that the defendants are offering to this Court is the hypothesis that mutually antagonistic defenses exist, without any evidence to suggest that they exist in fact. What seems apparent is the belief of each defendant that his chances for acquittal would be enhanced by severance. That rationale was insufficient even prior to *Zafiro v. United States*.

*State v. Manley*, Del.Super., No. 9511007022, Barron, J., 1996 WL 527322 (Aug 1, 1996) (Mem.Op.). *See United States v. Martinez*, 1st Cir., 922 F.2d 914, 922 (1991). We have examined the merits of Stevenson's motion to sever his trial from Manley's and have reached the same conclusion.

The record reflects that neither Manley nor Stevenson testified, and neither presented evidence that directly implicated the other in their own defenses. The record also reflects that only one defendant fired the fatal shots that killed Heath. There were no eyewitnesses to the actual moment of the shooting.

One of Stevenson's primary concerns regarding the severance issue is that during cross-examination of the State's witnesses and during closing argument, Manley's attorney emphasized inconsistencies in eyewitness testimony that suggested Stevenson, and not Manley, was the triggerman. *See Outten v. State*, 650 A.2d at 1298. Stevenson's legal culpability is the same, however, whether he was convicted as a principal or as an accomplice in Heath's murder. *See* 11 *Del. C.* §§ 271, 275; *Skinner v. State*, Del.Supr., 575 A.2d 1108, 1124 (1990). Under Delaware law, where "the defendants agreed to [commit the crime, and] either defendant might have functioned as an accomplice who intended to promote or facilitate the subsequent acts of the other defendant as a principal, ... both [are] equally guilty of the consequential crimes ...." *Claudio v. State*, Del.Supr., 585 A.2d 1278, 1282 (1991). *See* 11 *Del. C.* § 271.

Nevertheless, the Superior Court carefully instructed the jury in an effort to eliminate any potential "spillover" effect in the evidence resulting from the joint trial of Stevenson and Manley. *See Skinner v. State*, 575 A.2d at 1120 (citing *Lampkins v. State*, Del. Supr., 465 A.2d 785, 795 (1983)). The Superior Court's final instructions directed the jury to segregate and consider the evidence separately as to each defendant. *See Robertson*, 630 A.2d at 1094. *See also Skinner*, 575 A.2d at 1120 (citing *Lampkins v. State*, 465 A.2d at 795 and *United States v. Cresta*, 1st Cir., 825 F.2d 538, 554–55 (1987)). The jury was further instructed to consider the liability of each defendant separately. The jury was also advised that a conclusion reached with regard to one defendant does not mean that the same conclusion will apply to the other defendant. *See Robertson v. State*, 630 A.2d at 1094; *Skinner v. State*, 575 A.2d at 1120.

The record reflects that there was substantial independent direct and circumstantial evidence to establish Stevenson's guilt for murder and the other charges in this case. A crime-scene eyewitness reported the license registration number of Stevenson's vehicle to police who responded quickly to Stevenson's home. Other eyewitnesses accurately described Stevenson's vehicle as the one which

fled the crime scene moments after the murder. Police observed Stevenson returning home shortly after the murder and apprehended him after a brief vehicle and foot chase. Ammunition consistent in make and model to the bullets recovered from Heath's body and the crime scene was found in Stevenson's vehicle. An eyewitness description of the driver of the vehicle at the crime scene was consistent with Stevenson's description at the time he was taken into custody by police. Heath had investigated the Macy's thefts and was scheduled to testify in Stevenson's felony theft trial within hours of being gunned down. This evidence of Stevenson's motive was supported by the discovery of Chona's address in the police vehicle which transported Stevenson.

■ A trial judge should "grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. at 539, 113 S.Ct. at 938. The record reflects that Stevenson has failed to sustain his burden of establishing substantial injustice and unfair prejudice. Thus, we hold that Stevenson was not prejudiced by a joint trial, i.e., denied a specific trial right or tried by a jury which could not make a reliable judgment about his individual guilt or innocence. *See Zafiro v. United States*, 506 U.S. at 538, 113 S.Ct. at 937.

### Continuance Denied
### Discretion Properly Exercised

■ Stevenson's next argument relates to the Superior Court's denial of his request for a continuance. On the first day of jury selection, Stevenson personally requested a continuance to enable a private attorney, who was not a member of the Delaware Bar, to enter an appearance and represent Stevenson at trial. Apparently, the attorney had recently been paid a retainer by Stevenson's family. According to Stevenson, a continuance was not sought earlier because "his mother had been saving money so that [she] could hire a private attorney to represent him in this case instead of being represented by a public defender." The Superior Court denied Stevenson's motion.

■ In support of his argument that the Superior Court abused its discretion, Stevenson asserts a Fifth Amendment due process violation. Due process "demands that a defendant be afforded an opportunity to obtain the assistance of counsel of his choice to prepare and carry out his defense." *United States v. Kikumura*, 3d Cir., 947 F.2d 72, 78 (1991). Due process is "satisfied so long as the accused is afforded a fair and reasonable opportunity to obtain particular counsel and there is no arbitrary action prohibiting the effective use of such counsel." *Id.*

■ Stevenson also asserts a violation of his Sixth Amendment "right to select and to be represented by private counsel." The Sixth Amendment guarantees a criminal defendant the right to the effective assistance of counsel at trial. U.S. Const., amend. VI; *United States v. Kikumura*, 947 F.2d at 78. A defendant does not, however, have the absolute right to counsel of his or her choice. *Wheat v. United States*, 486 U.S. 153, 159, 108 S.Ct. 1692, 1697, 100 L.Ed.2d 140 (1988); *United States v. Kikumura*, 947 F.2d at 78; *In re Kennedy*, Del.Supr., 472 A.2d 1317, 1331 (1984).

The Third Circuit Court of Appeals has stated:

Desirable as it is that a defendant obtain private counsel of his own choice, that goal must be weighed and balanced against an equally desirable public need for the efficient and effective administration of criminal justice. The calendar control of modern criminal court dockets, especially in metropolitan communities, is a sophisticated operation constantly buffeted by conflicting forces. The accused's rights—such as those relating to a speedy trial, to an adequate opportunity to prepare the defense, and to confront witnesses—are constantly in potential or real conflict with the prosecution's legitimate demands for some stability in the scheduling of cases. The availability of prosecution witnesses is often critically dependent on the predictability of the trial list. That delays and postponements only increase the reluctance of

witnesses to appear in court, especially in criminal matters, is a phenomenon which scarcely needs elucidation.

*United States ex rel. Carey v. Rundle*, 3d Cir., 409 F.2d 1210, 1214 (1969).

■ In deciding if a continuance should be granted, in addition to considering the efficient administration of criminal justice, the State's position, and the rights of the moving defendant, the trial judge must also consider the rights of co-defendants who may be prejudiced by a continuance. *United States v. Kikumura*, 947 F.2d at 78. "To permit a continuance to accommodate one defendant may in itself prejudice the rights of another defendant whose trial is delayed because of the continuance." *Carey*, 409 F.2d at 1214.

■ In determining whether to grant a criminal defendant's motion for a continuance on the eve of trial, for the express purpose of obtaining new counsel, the Superior Court must consider all the circumstances present in the individual case at the time the request is denied. *Riley v. State*, Del.Supr., 496 A.2d 997, 1018 n. 27 (1985) (citing *Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S.Ct. 841, 849, 11 L.Ed.2d 921 (1964)). The United States Supreme Court has stated:

> The matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel. Contrariwise, a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality. There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.

*Ungar v. Sarafite*, 376 U.S. at 589–90, 84 S.Ct. at 849–50 (citations omitted). "The denial of a continuance for change of counsel on the eve of trial is not an abuse of discretion when: (1) there had been no previous complaint about counsel; (2) the defendant had a prior opportunity to obtain substitute counsel; and (3) obtaining substitute counsel was uncertain and appeared to be a dilatory tactic." *Riley v. State*, 496 A.2d at 1018.[16]

The record reflects that there had been no complaint made about either of Stevenson's attorneys. Stevenson knew since January 22, 1996, the date of the Superior Court's scheduling order, that the jury selection would begin October 21, 1996 and the trial would begin October 28, 1996. Stevenson had approximately nine months in which to obtain private counsel. Stevenson waited until jury selection started to present a motion to replace his attorneys. Furthermore, in this case, Stevenson's co-defendant, Michael Manley, opposed Stevenson's application for a continuance.

Under the circumstances of this case, the Superior Court did not abuse its discretion in refusing the defendant's request for a continuance. The timing of Stevenson's motion, on the first day of jury selection, prompted the Superior Court to state that the "application just comes too late under the circumstances of this particular case." The record supports that conclusion. There was no abuse of discretion in the Superior Court's denial of Stevenson's motion for a continuance. *Riley v. State*, 496 A.2d 997.

---

16. Factors relied on by other courts to determine whether a delay for the purpose of changing counsel is reasonable include:

> the length of the requested delay; whether other continuances have been requested and granted; the balanced convenience or inconvenience to the litigants, witnesses, counsel, and the court; whether the requested delay is for legitimate reasons, or whether it is dilatory, purposeful, or contrived; whether the defendant contributed to the circumstance which gives rise to the request for a continuance; whether the defendant has other competent counsel prepared to try the case, including the consideration of whether the other counsel was retained as lead or associate counsel; whether denying the continuance will result in identifiable prejudice to defendant's case, and if so, whether this prejudice is of a material or substantial nature; the complexity of the case; and other relevant factors which may appear in the context of any particular case.

*United States v. Burton*, D.C.Cir., 584 F.2d 485, 490–91 (1978) (footnotes omitted).

### Other Crimes
### Evidence of Motive

■ According to the State's theory, Heath was murdered to eliminate him as a witness at Stevenson's pending trial for theft. To establish this motive, the State sought permission to introduce evidence of pending theft charges against Stevenson and Heath's role in that prosecution. The Superior Court concluded that this "other crime" evidence was admissible after conducting an analysis pursuant to D.R.E. 404(b) and *Getz v. State*, Del.Supr., 538 A.2d 726 (1988). Stevenson argues that this ruling was erroneous.

In *Getz*, this Court established guidelines for the admission of "other crime" evidence under D.R.E. 404(b):

(1) The evidence of other crimes must be material to an issue or ultimate fact in dispute in the case. If the State elects to present such evidence in its case-in-chief it must demonstrate the existence, or reasonable anticipation, of such a material issue.
(2) The evidence of other crimes must be introduced for a purpose sanctioned by Rule 404(b) or any other purpose not inconsistent with the basic prohibition against evidence of bad character or criminal disposition.
(3) The other crimes must be proved by evidence which is "plain, clear and conclusive." *Renzi v. State*, Del.Supr., 320 A.2d 711, 712 (1974).
(4) The other crimes must not be too remote in time from the charged offense.
(5) The Court must balance the probative value of such evidence against its unfairly prejudicial effect, as required by D.R.E. 403.
(6) Because such evidence is admitted for a limited purpose, the jury should be instructed concerning the purpose for its admission as required by D.R.E. 105.

*Getz v. State*, 538 A.2d at 734.

In this case, the guidelines of *Getz* were considered and properly applied by the Superior Court. First, the State's purpose for introducing evidence of the other crime, i.e., the theft from Macy's, during its case-in-chief was to establish Stevenson's motive for the murder. The motive was to eliminate Heath, thereby preventing his testimony in Stevenson's theft prosecution. Second, motive is an exception that is expressly sanctioned by Rule 404(b). The evidence presented by the State against Stevenson also comported with *Getz* guidelines three and four, i.e., that the other crimes were proved by evidence that is "plain, clear and conclusive" and that the other crimes were not too remote in time from the charged offense. Stevenson had made a full confession, in writing. Furthermore, the thefts had occurred only approximately fourteen months prior to Heath's murder and were scheduled for trial on the date of Heath's death.

The fifth guideline in *Getz* requires the trial judge to balance the "other crime" evidence's probative value against the danger of *unfair* prejudice to the defense, pursuant to Rule 403. *Deshields v. State*, Del.Supr., 706 A.2d 502 (1998). Any evidence that is properly admissible ·during the State's case-in-chief is prejudicial to the defendant in the sense that it enhances the likelihood of a conviction. The State's evidence of Stevenson's "other crimes" at his murder trial established that Heath, as the chief investigating security officer at the department store where the thefts took place, was the primary witness against Stevenson. The record supports the Superior Court's conclusion that this evidence was highly probative to the State's case and not *unfairly* prejudicial to Stevenson.

■ Stevenson contends that the Superior Court erred in the application of the sixth *Getz* guideline by not giving the jury an immediate Rule 105 limiting instruction. Although it may be preferable, there is no requirement that the trial judge deliver a limiting instruction contemporaneously with the introduction of other crime evidence, in the absence of a timely request from defense counsel. *See Zimmerman v. State*, Del. Supr., 565 A.2d 887, 890 (1989); *Howard v. State*, Del.Supr., 549 A.2d 692, 693, 694 (1988); *Weber v. State*, Del.Supr., 547 A.2d 948, 963 (1988). The Superior Court waited until the general instructions at the conclusion of the guilt phase of the trial to caution the jury not to infer from the other crime

evidence a general criminal disposition on Stevenson's part. The jury was instructed as follows:

> Ladies and gentlemen of the jury, you have heard evidence that one of the defendants; namely, David Stevenson, allegedly committed thefts while an employee at Macy's, and the deceased, Kristopher Heath, participated in the investigation which led to the theft charges being placed against Stevenson.

> You may not use this evidence as proof that David Stevenson is a bad person, and therefore, probably committed the offenses contained in the indictment. You may use this evidence only to help you in deciding whether David Stevenson or Michael Manley was one of the persons who committed the offenses contained in the indictment.

> The State claims that the prior alleged theft evidence might tend to show a motive on Stevenson's part or on Manley's part to commit the offenses contained in the indictment.

> You may consider the prior alleged theft evidence to help you decide whether or not such evidence tends to show a motive on Stevenson's part or on Manley's part to commit the offenses, and to help you decide whether or not such evidence tends to identify them as the perpetrators of the offenses contained in the indictment for which the defendants are now on trial.

> You are instructed that you may not use the prior alleged theft evidence for any other purpose whatsoever. Further, the fact that the Defendant Stevenson had been indicted for the alleged offenses arising out of the Macy's internal theft investigation is not evidence of his guilt with regard to those offenses. As previously stated, an indictment is a mere accusation, and is not evidence of guilt.

The record reflects that the Superior Court properly admitted "other crime" evidence about Stevenson's pending trial on Macy's theft charges at the time of the murder.[17]

## No Plain Error
### Prosecutor's Closing Arguments

Stevenson contends that several specific remarks made by the State in its closing argument and rebuttal summation were improper. Stevenson failed to object to any of the remarks at the time they were made. Therefore, he must now demonstrate that there was plain error. "To establish plain error ... [Stevenson] has the burden of showing that the improper arguments by the prosecutor 'not only created the possibility of prejudice, but that the errors worked to his actual substantial disadvantage.'" *Sullivan v. State,* Del.Supr. 636 A.2d 931, 942 (1994) (quoting *Saunders v. State,* Del.Supr., 602 A.2d 623, 625 (1984)).

Stevenson's first contention is that the prosecutors' remark that Stevenson "was nailed" amounted to an expression of the prosecutor's personal belief that Stevenson was guilty of murdering Heath. The record reflects that the context for that remark did not relate to the murder, however, but to the theft charges that were pending at the time of the murder and which the State contended constituted Stevenson's motive for killing Heath. The prosecutor's statement that Stevenson "was nailed" on the theft charges was based on evidence in the record, e.g., Stevenson's confession to that theft. It was not an expression of the prosecutor's personal belief in Stevenson's guilt concerning the charge of murdering Heath.

Stevenson's next contention relates to the prosecutor's statement that importuned the jury to do justice for the victim. That invocation is similar to remarks that were also examined by this Court under the plain error standard of review in *Govan v. State,* Del.Supr., No. 363, 1993 Walsh J. (Jan. 30, 1995)(ORDER). In *Govan,* this Court held there was no plain error when the prosecutor told the jurors that the two murder victims were "entitled to justice." *Id.* Similarly, the record in this case does not reflect

---

17. Stevenson argues that the Superior Court erred in admitting evidence that, about a week before Heath's murder, Stevenson told a friend that he was thinking about acquiring a gun for his own protection. Acquiring a gun for self-protection is not a crime or bad act. That evidence was properly admitted under D.R.E. 402.

that the prosecutor's isolated remarks about justice for the victim constituted plain and reversible error.

■ Finally, Stevenson challenges that portion of the prosecutor's rebuttal summation regarding the testimony of the FBI agent who had tested both defendants' hands and clothing for gunpowder residue. No gunpowder residue was found on Stevenson's hands or clothing. At trial the agent testified about the various reasons for the absence of residue on an individual who had recently fired a gun. In his closing argument to the jury, Stevenson's attorney stated:

> I would submit to you it's clear what [the agent's] job and his purpose was when he took the witness stand as a State's witness. He had to explain why that atomic absorption test that the State chose to give both defendants came back negative. That was his job.

Those remarks by Stevenson's attorney suggested that the FBI agent was not testifying as an objective expert. In this context, it was proper for the prosecutor to reply that the agent's "job is not to come in here and do anything for any party but to tell the truth." The prosecutor's statement was an appropriate and measured response to the closing argument made by Stevenson's attorney. *Cf. Brokenbrough v. State,* Del.Supr., 522 A.2d 851, 858 (1987).

### Accomplice Liability
### Jury Properly Instructed

Article I, Section 4 of the Delaware Constitution and Superior Court Criminal Rule 31(a) require that a jury verdict be unanimous. *Probst v. State,* Del.Supr., 547 A.2d 114, 120 n. 7 (1988). At Stevenson's trial, the Superior Court instructed the jury on accomplice liability, and issued a general theory unanimity instruction. The Superior Court correctly informed the jurors that, under Delaware law, to find a defendant guilty under a theory of accomplice liability, they must unanimously find that the requisite degree of complicity existed between the parties and that the crime, Heath's murder, was committed by one of them. *See Claudio v. State,*

Del.Supr., 585 A.2d 1278, 1282 (1991). On appeal, Stevenson argues that the trial judge should have issued a single theory unanimity instruction, requiring the jury to decide specifically which defendant was the principal and which was the accomplice.

■ Stevenson's argument is not persuasive for two reasons. First, the specific identification of the principal and accomplice is not a prerequisite to a finding of guilt for two persons under an accomplice liability theory. *See Claudio v. State,* 585 A.2d at 1282. Second, Stevenson's reliance on *Probst,* for the proposition that the defendants were entitled to a single theory unanimity instruction, is misplaced. A single theory unanimity instruction is required " 'if (1) a jury is instructed that the commission of any one of several alternative actions would subject the defendant to criminal liability, (2) the actions are conceptually different and (3) the state has presented evidence on each of the alternatives.' " *Probst v. State,* 547 A.2d at 121 (citations omitted).

■ In *Probst,* "a specific unanimity instruction was desirable since there was one charge (assault) and evidence of two separate incidents (Probst's shots and Miller's shots) to support a conviction on alternate theories of liability." *Id.* at 124 (Opinion on Motion for Rehearing en Banc). Unlike *Probst,* the fatal shooting of Heath involved a single individual with a single gun and not distinct contemporaneous actions by two individuals who were each firing weapons at the same victim. This Court has stated:

> In a criminal charge involving one incident and two people, the jury is regarded as being unanimous if, without specifically identifying who was the principal and who was the accomplice, they all agree that one of the two actors performed all of the elements of the offense charged as a principal and that both actors knowingly participated in the alleged criminal act.

*Probst v. State,* 547 A.2d at 123 (Opinion on Motion for Rehearing en Banc) (footnote omitted). Consequently, a single theory unanimity instruction was not required in this case. The Superior Court's instructions to the jury were a correct statement of Dela-

ware law. Stevenson's argument on this issue is without merit.

### Recusal not Required
### No Extrajudicial Knowledge

Stevenson argues that the judge should have recused himself from presiding over Stevenson's capital murder trial because he had presided over a suppression hearing in the Macy's theft case against Stevenson and had heard the testimony of the murder victim, Heath. There was no request during trial that the trial judge recuse himself. That claim has been waived unless Stevenson can demonstrate plain error. Supr. Ct. R. 8.

To serve as a disqualifying factor, the alleged bias or prejudice of the judge "must stem from an extrajudicial source." *Jackson v.. State,* Del.Supr., 684 A.2d 745, 753 (1996) (quoting *Los v. Los,* Del.Supr., 595 A.2d 381, 384 (1991)). The trial judge's familiarity with Heath was entirely attributable to Heath's appearance as a witness during a suppression hearing in a criminal case. Thus, any knowledge of Heath or contact with Heath by the Superior Court was exclusively from a judicial source and in a judicial context.

Stevenson has not presented any indication of bias or prejudice from an extrajudicial source. Accordingly, Stevenson's recusal argument is not supported by the record. *See Weber v. State,* Del.Supr., 547 A.2d 948, 951–52 (1988). Stevenson has failed to carry his burden of demonstrating plain error.

### DEATH PENALTY
### STATUTORILY MANDATED REVIEW

This Court will now undertake the review that is statutorily mandated following the imposition of a death sentence in Delaware. 11 *Del. C.* § 4209(g). *See, e.g., Jackson v. State,* Del. Supr ., 684 A.2d 745, 754 (1996); *Gattis v. State,* Del.Supr., 637 A.2d 808, 821–23 (1994); *Dawson v. State,* Del.Supr., 637 A.2d 57, 65–68 (1994); *Sullivan v. State,* Del.Supr., 636 A.2d 931, 948–51 (1994); *Wright v. State,* Del.Supr., 633 A.2d 329, 339–43 (1993). Although the statutory review by this Court is limited, that review is not perfunctory. *Dawson v. State,* 637 A.2d at 65. *See Dobbert v. Florida,* 432 U.S. 282, 295, 97 S.Ct. 2290, 2299, 53 L.Ed.2d 344 (1977). A death sentence may be imposed only in accordance with the bifurcated procedure prescribed by 11 *Del. C.* § 4209. Section 4209(g)(2) provides as follows:

The Supreme Court shall limit its review under this section to the recommendation on and imposition of the penalty of death and shall determine:

a. Whether, considering the totality of evidence in aggravation and mitigation which bears upon the particular circumstances or details of the offense and the character and propensities of the offender, the death penalty was either arbitrarily or capriciously imposed or recommended, or disproportionate to the penalty recommended or imposed in similar cases arising under this section.

b. Whether the evidence supports the judge's finding of a statutory aggravating circumstance as enumerated in subsection (e) of this section and, where applicable, § 636(a)(2)–(7) of this title.

11 *Del. C.* § 4209(g)(2). In performing its mandatory statutory review, this Court remains cognizant that "death as a punishment is unique in its severity and irrevocability." *Dawson v. State,* 637 A.2d at 66 (quoting *Pennell v. State,* Del.Supr., 604 A.2d 1368, 1375 (1992) (citation omitted)).

This Court has traditionally commenced its mandatory statutory review by initially addressing subparagraph (b) of Section 4209(g)(2). That subsection requires this Court to examine the evidence in the record to determine whether it supports the findings of the Superior Court judge which relate to the establishment of statutory aggravating circumstances. 11 *Del. C.* § 4209(e). Thereafter, two additional inquiries are required by subparagraph (a) of Section 4209(g)(2): first, whether the Superior Court judge's imposition of the death penalty was either arbitrary or capricious; and second, whether the death penalty imposed was disproportionate to the penalty imposed in similar cases arising under this statute. Each question re-

quires a consideration of the totality of evidence in aggravation and mitigation which bears upon the particular circumstances or details of the offense and the character and propensities of the offender. *Wright v. State*, 633 A.2d at 339 (quoting *Red Dog v. State*, Del.Supr., 616 A.2d 298, 306–07 (1992) (certain citations and quotation marks omitted)); *Gattis v. State*, 637 A.2d at 821; *Dawson v. State*, 637 A.2d at 66; *Sullivan v. State*, 636 A.2d at 949. *See generally Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).

### Multiple Delineation Upheld
### Statutory Aggravating Circumstances

■ In a preliminary argument, Stevenson alleges that Delaware's Death Penalty Statute has too many statutory aggravating circumstances (twenty-two) and, therefore, fails to genuinely narrow the class of murderers subject to the death penalty. Stevenson does not assert that the twenty-two statutory aggravating circumstances, considered individually, apply to every defendant convicted of murder or are unconstitutionally vague. *See Tuilaepa v. California*, 512 U.S. 967, 972, 114 S.Ct. 2630, 2635, 129 L.Ed.2d 750 (1994). Stevenson also does not argue that the statutory aggravating circumstances established in his own case were constitutionally infirm or excessive. His argument is simply that Delaware's Death Penalty Statute contains too many aggravators.

An identical argument was considered and rejected in *State v. Steckel*, Del.Super., Cr.A. No. IN96–06–1760, Carpenter, J., 1996 WL 936121 (Dec. 11, 1996) (Mem.Op.) (denying Motion to Strike Death Penalty). In *Steckel*, the Superior Court observed that this Court approved the new death penalty statute in "all" respects when there were 18 statutory aggravating circumstances in *State v. Cohen*, Del. Supr., 604 A.2d 846, 848 (1992). At the time *Steckel* was decided, four additional aggravators had been added by the General Assembly, bringing the number to the current total of twenty-two. In *Steckel*, the Superior Court concluded that the Delaware statute is not inconsistent with the statutes in several other death penalty states. In this

appeal, Stevenson has failed to demonstrate how the delineation of twenty-two otherwise valid statutory aggravating circumstances in the Delaware Death Penalty Statute makes his own death sentence unconstitutional or otherwise invalid. *State v. Steckel*, Del.Super., Cr.A. No. IN96–06–1760, Carpenter, J., 1996 WL 936121 (Dec. 11, 1996).

### Statutory Aggravating Circumstances
### Record Evidence Supports All Findings

The State contended that four statutory aggravating circumstances were applicable in this case:

1. The murder was committed against a person who was a witness to a crime and who was killed for the purpose of preventing the witness's appearance and testimony in a criminal proceeding involving the crime. *See* 11 *Del. C.* § 4209(e)(1)g.

2. Defendant Stevenson caused or directed another to commit murder. Defendant Manley committed murder as an agent of another person. *See* 11 *Del. C.* § 4209(e)(1)m.

3. At the time of the killing, the victim had provided a police agency with information concerning criminal activity, and the killing was in retaliation for the victim's activities in providing information concerning criminal activity to a police agency. *See* 11 *Del. C.* § 4209(e)(1)t.

4. The murder was premeditated and the result of substantial planning. *See* 11 *Del. C.* § 4209(e)(1)u.

The jury and trial judge concluded that the State's evidence established the existence of those four statutory aggravating circumstances beyond a reasonable doubt. Stevenson contends that those findings are not supported by the evidence.

■ The first aggravating circumstance alleged by the State was that the murder was committed against a person who was a witness to a crime for the purpose of preventing the witness from testifying at a criminal proceeding involving that crime. 11 *Del. C.* § 4209(e)(1)g. The Superior Court noted that, although Heath was not an eyewitness to the internal thefts at Macy's, he had inves-

tigated the thefts and would have testified as a witness for the State at Stevenson's trial for theft. The Superior Court concluded that the Delaware General Assembly intended the word "witness" to include a person who has information about a crime and whose testimony was expected at a trial or other proceeding. The Superior Court opined that if the General Assembly had intended to limit the meaning of the word "witness" to an "eyewitness," it would have done so explicitly.[18] We agree.

The uncontroverted evidence established that the victim, Kristopher Heath, was the chief investigating security officer in the credit card theft case against Stevenson. Heath was murdered on the morning that the trial for theft was to begin and where Heath would have testified against Stevenson as a *witness* for the prosecution. The record supports the Superior Court's finding that the first statutory aggravating circumstance had been proven by the State beyond a reasonable doubt.

■ The second statutory aggravating circumstance asserted by the State alleged that Stevenson directed another, Manley, to kill the victim. 11 *Del. C.* § 4209(e)(1)m. The jury found that the testimony of eyewitnesses at trial supported the conclusion that Manley was the shooter while Stevenson drove the getaway car. The two were apprehended together, following a brief motor vehicle and foot pursuit, approximately thirty minutes after the murder. Manley and Stevenson were good friends. The record reflects that only Stevenson had a motive to kill the victim. The logical conclusion to be drawn from this evidence is that Manley killed Heath at Stevenson's direction. The Superior Court concluded that the jury was

fully warranted in unanimously finding beyond a reasonable doubt, based upon the direct and circumstantial evidence presented at trial, that Stevenson caused or directed Manley to commit murder, and that Manley committed murder as an agent of Stevenson. The record supports those conclusions.

■ The third statutory aggravating circumstance identified by the State alleged that the victim, Heath, was killed in retaliation for supplying information concerning criminal activity to the police. 11 *Del. C.* § 4209(e)(1)t. Heath had informed the police of Stevenson's thefts. The Superior Court concluded that the State's evidence supported finding the existence of this aggravator beyond a reasonable doubt. Nevertheless, the Superior Court also found that the more compelling explanation for the murder was to prevent Heath from testifying at trial. Accordingly, the Superior Court gave this aggravator no independent weight in his written sentencing decision.

■ The fourth statutory aggravating circumstance alleged by the State asserted that the murder was premeditated and the result of substantial planning. 11 *Del. C.* § 4209(e)(1)u. In assessing this aggravator, the Superior Court looked to Florida's jurisprudence for guidance. It noted that Florida has a statutory aggravating circumstance similar to Section 4209(e)(1)u. In Florida, a statutory aggravating circumstance exists when the murder was committed in a "cold, calculated, and premeditated manner without any pretense of moral or legal justification." *Fla. Stat.* § 921.141(5)(i). The Superior Court found that this statutory aggravating circumstance is generally applied in Florida to murders which are characterized as executions or contract murders. *McCray v. State,*

---

18. As noted by the Superior Court, the list of statutory aggravating factors in Pennsylvania's Death Penalty Statute contains a similar provision. That provision states in part as follows:

> The victim was a prosecution witness to a murder or other felony committed by the defendant and was killed for the purpose of preventing his testimony against the defendant in any grant jury or criminal proceeding involving such offenses.

42 Pa.C.S.A. § 9711(d)(5).

The Pennsylvania Supreme Court rejected the argument that Section 9711(d)(5) applied only to eyewitnesses. *Commonwealth v. Zettlemoyer,* Pa. Supr., 500 Pa. 16, 454 A.2d 937, 952 (1982). *See also People v. Jones,* Cal.Supr., [13 Cal.4th 535, 549, 54 Cal.Rptr.2d 42, 51], 917 P.2d 1165, 1175 (1996) (rejecting appellant's claim that "witness to a crime" referred only to an eyewitness to a crime). Both of these cases were relied upon to support the Superior Court's conclusion that the word "witness" in Delaware's Death Penalty Statute includes but is not limited to "eyewitness." The rationale in both cases is persuasive.

Fla.Supr., 416 So.2d 804, 807 (1982). For this statutory aggravating circumstance to apply in Florida, there must be a greater degree of premeditation than is evidenced in the usual intentional homicide:

> We have consistently held that application of this aggravating factor requires a finding of *heightened* premeditation; i.e., a cold-blooded intent to kill that is more contemplative, more methodical, more controlled, than that necessary to sustain a conviction for first-degree murder.

*Nibert v. State,* Fla.Supr., 508 So.2d 1, 4 (1987). *See also Rogers v. State,* Fla.Supr., 511 So.2d 526, 533 (1987). Based upon this guidance from Florida's jurisprudence, the Superior Court instructed the jury regarding the fourth statutory aggravating factor, as follows:

> This statutory aggravating circumstance applies to those murders which may be characterized as executions or contract murders. This statutory aggravating circumstance requires a finding of *heightened* premeditation, i.e., a cold-blooded intent to kill that is more contemplative, more methodical, more calculating and controlled than that necessary to sustain a conviction of first degree murder. It requires a finding that the murder was the result of substantial planning.

The Superior Court found that reasonable inferences drawn from the evidence at trial in the case *sub judice* indicated Manley and Stevenson went to Heath's current residence and to his prior residence on the night before the murder. Heath was not at either location. On the morning of the murder, Stevenson and Manley waited in the parking lot until Heath left his apartment and walked toward his car. Manley then executed Heath by shooting him in the back five times. The Superior Court then decided that the jury could reasonably determine from the evidence that the State had established the existence of its fourth alleged statutory aggravating circumstance beyond a reasonable doubt, i.e., that the murder of Heath was the result of substantial planning and premeditation on the part of Stevenson and Manley.

The record reflects that the evidence supports the Superior Court's findings that all four of the statutory aggravating circumstances alleged by the State, and enumerated in Section 4209(e), were established beyond a reasonable doubt in Stevenson's case. 11 *Del. C.* § 4209(g)(2)b. Therefore, we now proceed to the two additional inquiries required of this Court under Section 4209(g)(2)a.

### Death Penalty
### Not Arbitrary or Capricious

The Superior Court was satisfied that the State had proven by substantial and reliable evidence the existence of the following non-statutory aggravating circumstances, some of which apply only to Stevenson, one of which applied only to Manley, and some of which apply to both defendants: victim impact; at the time of murder, Heath was unarmed and unable to defend himself since he was shot in the back; Chona's name, address and telephone number were in Stevenson's possession, making him (Chona) a potential victim;[19] Stevenson's theft of approximately $4,500 from Macy's by fraudulently obtaining Macy's gift certificates; Stevenson's statement to Detective Ford that he committed the thefts as a result of a debt he owed to a Philadelphia gang;[20] Stevenson viewed Heath's life as less significant than a blemish on his criminal record; Manley killed Heath, a complete stranger who had never caused him any harm; and, Heath was a completely innocent victim who was killed merely for doing his job.

The Superior Court found that the following mitigating circumstances existed with re-

---

**19.** The Superior Court found that a reasonable inference could be drawn that Chona was a potential target. Because the exact reason for Stevenson to have been carrying this information on his person cannot be determined with certainty, the Superior Court gave this non-statutory aggravating circumstance only minimal weight.

**20.** In a footnote, the Superior Court stated, "if Stevenson was telling the truth, this admission reflects poorly on his character. If he was lying to [Detective] Ford, this also reflects poorly on his character. The character of the defendant is a relevant factor in making a sentence determination."

gard to Stevenson: the absence of any prior criminal conviction; his youth; [21] his love for his family and their love for him; his lack of appropriate male role models as a child; [22] his positive personality traits; his positive acts and attributes; his potential for rehabilitation; his caring for and ability to help others; his positive adjustment to incarceration; his desire to better himself; and his ability to work hard.

■ " 'The procedure to be followed by the trial judges ... is not a mere counting process of X number of aggravating circumstances and Y number of mitigating circumstances, but rather a reasoned judgment as to what factual situations require the imposition of death and which can be satisfied by life imprisonment in light of the totality of the circumstances present.' " *State v. Cohen*, Del.Supr., 604 A.2d 846, 849 (1992) (quoting *State v. Dixon*, Fla.Supr., 283 So.2d 1, 10 (1973)). In its sentencing decision, the Superior Court considered the statutory aggravating circumstances alleged by the State. It also carefully reviewed the non-statutory aggravating circumstances established by the State and the mitigating evidence presented by Stevenson. After setting forth its analysis of the statutory and non-statutory aggravating circumstances, as well as the mitigating circumstances, the Superior Court weighed them. The Superior Court then announced its sentencing decision, stating, in part:

> On the morning of November 13, 1995, the day Heath was to testify at Stevenson's trial, Stevenson and Manley lay in wait for the unsuspecting victim to merge from his apartment. When Heath appeared, Manley went into action.
>
> Manley approached Heath as he was facing the rear of his jeep. Manley walked up behind the unarmed and defenseless victim and pumped five 9 mm copper-jacketed bullets into his body. Upon accomplishing their intended mission of death,

the defendants sped from the scene in their futile attempt to elude detection.

This Court cannot recall a more chilling and premeditated, execution-style murder than was conclusively proven in this case. A security officer was preparing to go to court to seek redress on behalf of his employer. That this route was short-circuited by his elimination constitutes an attack upon the very foundations of our judicial branch of government.

Utter contempt and disdain for the judicial process were evidenced by Manley's and Stevenson's premeditated and outrageously cold-blooded assassination of a wholly innocent witness to a crime. Is the most extreme form of punishment warranted in this case?

Manley and Stevenson are not hardened criminals. Everything in their backgrounds ostensibly points in favor of mitigation. At the same time, the defendants' backgrounds offer no excuse for what they did on November 13, 1995. These were not drug-addicted sociopaths off on a rampage. Indeed, Manley and Stevenson are intelligent and gifted young men with support and potential. Arguably, their backgrounds magnify the ignominy of the premeditated murder which they committed.

Manley, in his December 11, 1996, supplemental submission to the Court, argued that the death penalty is only warranted in a case involving both a despicable set of facts and a despicable defendant. Yet, the death penalty is reserved for either "the worse criminals *or the criminals who commit the worst crimes* ..." *Furman v. Georgia*, 408 U.S. 238, 294, 92 S.Ct. 2726, 2754, 33 L.Ed.2d 346 (1972) (Brennan, J., concurring) (emphasis added). Similarly, "certain crimes are themselves so grievous an affront to humanity that the only adequate response may be the death penalty." *Gregg v. Georgia*, 428 U.S. 153, 184, 96 S.Ct. 2909, 2930, 49 L.Ed.2d 859 (1976). In this Court's view, the calculated and cowardly execution of a State's witness

---

**21.** The Superior Court noted that Stevenson was 21 years old at the time of the murder.

**22.** This mitigating circumstances was given little weight by the Superior Court "in light of the

obvious parental attention paid to him by his mother who tried to give him good morals and who worked hard to see him succeed."

constitutes a case calling for such a response.

The murder of Kristopher Heath was horrific and shocking. The particular circumstances or details of the commission of the offense so heavily outweigh the mitigating character and propensities of each offender that, along with the other aggravating circumstances found to exist, a sentence of death is warranted for both defendants.

The record reflects that the Superior Court carefully considered the totality of the evidence in aggravation and mitigation, which related to the particular circumstances of the murder of Heath, as well as to the character and propensities of Stevenson. *See* 11 *Del. C.* § 4209(g)(2)a; *Dawson v. State*, Del.Supr., 637 A.2d 57, 67 (1994); *Sullivan v. State*, Del.Supr., 636 A.2d 931, 950 (1994). The record reflects that the Superior Court's decision to impose the death sentence was "the product of a deliberate, rational and logical deductive process." *Red Dog v. State*, Del.Supr., 616 A.2d 298, 310 (1992). After a careful review of the entire record, this Court concludes that the sentence of death was not imposed upon Stevenson by the Superior Court either arbitrarily or capriciously. 11 *Del. C.* § 4209(g)(2)a.

### Death Penalty
### Proportionality Review

The final issue that this Court must analyze in its mandatory review is whether the Superior Court judge's imposition of the death penalty upon Stevenson was disproportionate to the penalty imposed in other cases arising under the Delaware death penalty statute. 11 *Del. C.* § 4209(g)(2)a. In answering that inquiry, this Court has reviewed the "universe" of cases. (*See* Appendix). The "universe" of cases is comprised of those First Degree Murder cases which have included a penalty hearing and in which the sentence has become final, either without or following a review by this Court. *Ferguson v. State*, Del.Supr., 642 A.2d 772, 789 (1994). Section 4209 was amended in 1991 by Chapter 189 of Delaware Laws Volume 68. (*See* Appendix). "Although the significant 1991

changes in the statutory scheme create a significant dissimilarity between the pre–1991 cases and the post–1991 cases in the universe, pre–1991 jury decisions are nevertheless 'pertinent' to our proportionality analysis." *Lawrie v. State*, Del.Supr., 643 A.2d 1336, 1350 (1994).

Stevenson argues that his death sentence is disproportionate. He cites other instances in the Delaware universe of cases, in which eight jurors recommended a death sentence and four opposed, but the defendant was given a sentence of life in prison by the Superior Court. Since the Delaware Death Penalty Statute was revised in 1991. Under the current law, "[t]he jury's function [in the sentencing phase of a capital murder proceeding] is purely advisory. The Superior Court judge may completely reject the recommendation of the jury." *Lawrie v. State*, 643 A.2d at 1346. The final decision between a sentence of life in prison or death is now vested exclusively with the judge of the Superior Court presiding over the particular case. *Shelton v. State*, Del.Supr., 652 A.2d 1, 5 (1995).

We have compared Stevenson's sentence with the penalties imposed in the universe of all First Degree Murder cases which have included a death penalty hearing. We have also considered objective factors such as the gravity of the offense, the circumstances of the crime, and the severity of the penalty. *See Red Dog v. State*, Del. Supr., 616 A.2d 298, 311 (1992). Contrary to Stevenson's contention, a death sentence is not disproportionate *per se*, simply because he had no prior record of violent criminal conduct.

The record in Stevenson's case reflects the existence of four statutory aggravating circumstances and significant non-statutory aggravating circumstances. *Dawson v. State*, Del.Supr., 637 A.2d 57, 68 (1994). In its sentencing decision, the Superior Court stated, "Utter contempt and disdain for the judicial process were evidenced by Manley's and Stevenson's premeditated and outrageously cold-blooded assassination of a wholly innocent witness to a crime." Like others sentenced to death in Delaware, Stevenson was found guilty of committing an unprovoked,

cold-blooded, execution-style murder of a defenseless person. *Red Dog v. State,* 616 A.2d at 311; *Gattis v. State,* Del.Supr., 637 A.2d 808, 823 (1994); *Dawson v. State,* 637 A.2d at 68; *Sullivan v. State,* Del.Supr., 636 A.2d 931, 950–51 (1994); *Wright v. State,* Del. Supr., 633 A.2d 329, 343 (1993).

"Sentencing decisions involve 'difficult and uniquely human judgments that defy codification and that buil[d] discretion, equity, and flexibility into a legal system.'" *Wright v. State,* 633 A.2d at 342–43 (quoting *McCleskey v. Kemp,* 481 U.S. 279, 311, 107 S.Ct. 1756, 1777, 95 L.Ed.2d 262 (1987) (citation omitted)). This Court has consistently noted in prior cases involving proportionality review that "[a] definitive comparison of the 'universe' of cases is almost impossible." *Red Dog v. State,* 616 A.2d at 311. *See also Gattis v. State,* 637 A.2d at 823; *Dawson v. State,* 637 A.2d at 68; *Sullivan v. State,* 636 A.2d at 950. This Court has concluded that the Superior Court judge's imposition of a sentence of death upon Stevenson was not disproportionate to the sentences imposed on other defendants in the relevant universe of cases involving death penalty hearings in Delaware. 11 *Del. C.* § 4209(g)(2)a.

### Conclusion

This Court has carefully reviewed the entire record and has considered and rejected all claims of error raised by Stevenson in this appeal. The evidence clearly supports the Superior Court judge's finding that three statutory aggravating circumstances were established beyond a reasonable doubt. 11 *Del. C.* § 4209(e), (g)(2)b.

This Court has concluded that the death sentence imposed upon Stevenson was imposed neither arbitrarily nor capriciously. This court has also determined that Stevenson's death sentence is not comparatively disproportionate to the sentences imposed in other First Degree Murder cases that have proceeded to a penalty hearing pursuant to the Delaware death penalty statute. 11 *Del. C.* § 4209(g)(2)a. *See Gattis v. State,* Del. Supr., 637 A.2d 808, 821–23 (1994); *Dawson*

*v. State,* Del.Supr., 637 A.2d 57, 67–69 (1994); *Sullivan v. State,* Del.Supr., 636 A.2d 931, 950–51 (1994). Accordingly, the underlying convictions and judgments, including the judgments imposing sentences of death for each count of Murder in the First Degree, are AFFIRMED.

The matter is remanded to the Superior Court for further proceedings consistent with this opinion and the setting of a new date of execution. *See* Super. Ct.Crim. R. 61(*l*). This Court's order of January 16, 1997, staying the execution of Stevenson's death sentence, shall terminate upon the issuance of this Court's mandate. The Clerk of this Court is directed to cause a copy of this opinion to be hand-delivered forthwith to the attorneys for the parties and to the Commissioner of the Department of Correction.

### APPENDIX

### CASES DECIDED UNDER 11 *Del. C.* § 4209

### As Amended in 1991 by 68 Del. Laws Ch. 189 [23]

| | |
|---|---|
| Case Name: | Meri–Ya C. Baker |
| Case No.: | IN90–12–1039, 1040 |
| County: | New Castle |
| Sentence: | Life Imprisonment |
| Decision on Appeal: | No. 360, 1992, 1993 WL 557951, Holland, J. (Dec. 30, 1993) (ORDER) |
| | |
| Case Name: | Jermaine Barnett |
| Case No.: | IN97–02–1238, 1131, 1334 |
| County: | New Castle |
| Sentence: | Death |
| Decision on Appeal: | Automatic and direct appeals pending |
| | |
| Case Name: | Hector S. Barrow |
| Case No.: | IN97–02–1353, 1356, 1359 |
| County: | New Castle |
| Sentence: | Death |
| Decision on Appeal: | Automatic and direct appeals pending |
| | |
| Case Name: | James B. Clark, Jr. |
| Case No.: | IN94–06–0543 through 0548 |
| County: | New Castle |
| Sentence: | Death |
| Decision on Appeal: | 672 A.2d 1004 (1996) |
| | |
| Case Name: | Charles M. Cohen |
| Case No.: | IN90–02–0474 thru 0477 |
| County: | New Castle |
| Sentence: | Life Imprisonment |

*Lawrie v. State,* Del.Supr., 643 A.2d 1336, 1352–56 (1994).

[23]. The universe of cases prior to 1991 is set forth in prior opinions by this Court, and those appendices are incorporated herein by reference.

Decision on Appeal: No direct appeal taken

Case Name: James T. Crowe
Case No.: IN95–12–1167 thru 1169
County: New Castle
Sentence: Life Imprisonment
Decision on Appeal: Direct appeal pending

Case Name: David F. Dawson
Case No.: IK86–0024; IK87–01–0841; 0843, 0845
County: New Castle (venue changed)
Sentence: Death
Decision on Appeal: 637 A.2d 57 (1994)

Case Name: Byron S. Dickerson
Case No.: IN90–12–1041, 1042
County: New Castle
Sentence: Life Imprisonment
Decision on Appeal: No. 353, 1992, 1993 WL 541913, Veasey, C.J. (Dec. 21, 1993) (ORDER)

Case Name: Cornelius E. Ferguson
Case No.: IN91–10–0576, 0578 thru 0581
County: New Castle
Sentence: Death
Decision on Appeal: 642 A.2d 772 (1994)

Case Name: Robert A. Gattis
Case No.: IN90–05–1017 thru 1019, 1106, 1107
County: New Castle
Sentence: Death
Decision on Appeal: 637 A.2d 808 (1994)

Case Name: Arthur Govan
Case No.: 92–01–0166
County: New Castle
Sentence: Life Imprisonment
Decision on Appeal: No. 363, 1993, 1995 WL 48359, Walsh, J. (Jan. 30, 1995) (ORDER)

Case Name: Robert W. Jackson, III
Case No.: IN–92–04–1222 thru 1227; IN92–04–1348 and 1349
County: New Castle
Sentence: Death
Decision on Appeal: 684 A.2d 745 (1996)

Case Name: Mark Anthony Kirk
Case No.: IN96–12–0754 and 0755, IN97–01–1773 thru 1776, IN96–12–0556
County: New Castle
Sentence: Life Imprisonment
Decision on Appeal: Direct appeal pending

Case Name: David J. Lawrie
Case No.: IK92–08–0179 thru 0185; IK92–09–0148 and 0149
County: Kent
Sentence: Death
Decision on Appeal: 643 A.2d 1336 (1994)

Case Name: Thomas M. Magner
Case No.: IN96–01–0258 and 0259, IN96–01–1421 thru 1425
County: New Castle
Sentence: Life Imprisonment
Decision on Appeal: Direct appeal pending

Case Name: Michael R. Manley
Case No.: IN95–11–1323 thru 1325, IN95–12–0684 thru 0686

County: New Castle
Sentence: Death
Decision on Appeal: Automatic and direct appeals pending

Case Name: Frank W. Moore, Jr.
Case No.: 92–09–0001, 0002, 1001, 2001, 3001
County: Sussex
Sentence: Life Imprisonment
Decision on Appeal: No. 214, 1993, 1994 WL 202289, Holland, J. (May 9, 1994) (ORDER)

Case Name: Jack F. Outten
Case No.: IN92–01–1144 and 1145
County: New Castle
Sentence: Death
Decision on Appeal: 650 A.2d 1291 (1994)

Case Name: James W. Perez
Case No.: IN–93–02–1191 and 1197
County: New Castle
Sentence: Life Imprisonment
Decision on Appeal: No. 207, 1993, Moore, J. (Feb. 3, 1994) (ORDER)

Case Name: James Allen Red Dog
Case No.: IN 91–02–1495 to 1503
County: New Castle
Sentence: Death
Decision on Appeal: 616 A.2d 298 (1992)

Case Name: Jose Rodriguez
Case No.: IN93–020–1121
County: New Castle
Sentence: Life Imprisonment
Decision on Appeal: No. 466, 1993, 1994 WL 679731, Walsh, J. (Nov. 29, 1994) (ORDER)

Case Name: Nelson W. Shelton
Case No.: IN–92–01–1154 and 1155
County: New Castle
Sentence: Death
Decision on Appeal: 652 A.2d 1 (1995)

Case Name: Steven W. Shelton
Case No.: IN–92–01–1149 and 1150
County: New Castle
Sentence: Death
Decision on Appeal: 650 A.2d 1291 (1994)

Case Name: Donald J. Simmons
Case No.: IN92–01–0770 thru 0772; IN92–01–1140 and 1141
County: New Castle
Sentence: Life Imprisonment
Decision on Appeal: No direct appeal taken

Case Name: Brian David Steckel
Case No.: IN96–06–1761 and 1762, IN96–06–1765 thru 1767, IN96–06–1773
County: New Castle
Sentence: Death
Decision on Appeal: Automatic and direct appeals pending

Case Name: David D. Stevenson
Case No.: IN95–12–0687 thru 0689, IN95–11–1047 thru 1049
County: New Castle
Sentence: Death
Decision on Appeal: Automatic and direct appeals pending

Case Name: Willie G. Sullivan

Case No.: IK–01–0192 thru 0196; IK92–02–0001; IK92–03–0022
County: Kent
Sentence: Death
Decision on Appeal: 636 A.2d 931 (1994)

Case Name: Antonio L. Taylor
Case No.: IK94–06–0047 through 0052
County: Kent
Sentence: Life Imprisonment
Decision on Appeal: 685 A.2d 349 (1996)

Case Name: Charles H. Trowbridge
Case No.: IK–91–07–0175, IK–91–06–0032 thru 0034
County: Kent
Sentence: Life Imprisonment
Decision on Appeal: No. 234, 1995, 1996 WL 145788, Veasey, C.J. (Mar. 4, 1996) (ORDER)

Case Name: John E. Watson
Case No.: IN–91–09–0020 thru 0025
County: New Castle
Sentence: Life Imprisonment
Decision on Appeal: No direct appeal taken

Case Name: Dwayne Weeks
Case No.: 92–01–0167
County: New Castle
Sentence: Death
Decision on Appeal: 653 A.2d 266 (1995)

Case Name: Roy R. Williamson
Case No.: S93–05–0249 thru 0255 and S93–05–1249 and 2249
County: Sussex
Sentence: Life Imprisonment
Decision on Appeal: 669 A.2d 95 (1995)

Case Name: Jermaine M. Wright
Case No.: IN91–04–0147 thru 1953
County: New Castle
Sentence: Death
Decision on Appeal: 671 A.2d 1353 (1996)

Case Name: Craig A. Zebroski
Case No.: IN96–09–1816 thru 1822
County: New Castle
Sentence: Death
Decision on Appeal: Automatic and direct appeals pending